665 P.2d 661

Kyle CHENEY and Georgia Cheney, husband and wife, d/b/a 7V Feedlots, Plaintiffs-Respondents-Cross Appellants,

v.

PALOS VERDES INVESTMENT CORPORATION, a California corporation, d/b/a Bell Brand Ranches, Inc., and Ronald Florance, Defendants-Appellants-Cross Respondents.

and

PALOS VERDES INVESTMENT CORPORATION, a California corporation, d/b/a Bell Brand Ranches, Inc., and Ronald Florance, Defendants-Counter Claimants,

v.

Kyle CHENEY and Georgia Cheney, husband and wife, d/b/a 7V Feedlots, Plaintiffs-Counter Defendants.

and

PALOS VERDES INVESTMENT CORPORATION, a California corporation, d/b/a Bell Brand Ranches, Inc., and Ronald Florance, Defendants-Counter Claimants,

v.

JOHN DOES I THROUGH X, XYZ Corporations I Through X, Counter Defendants.

No. 14003.

Supreme Court of Idaho.

June 15, 1983.

Jeffrey E. Rolig, of Hepworth, Nungester & Felton, John Hepworth, Hepworth, Nungester & Felton, Twin Falls, for defendants-appellants-cross respondents.

G. Lance Salladay, of Risch, Goss, Insinger & Salladay, Boise, for plaintiffs-respondents-cross appellants.

SHEPARD, Justice.

This is an appeal from a judgment in an action arising from an oral contract for the care and feeding of a herd of cattle. Appellants assert error in evidentiary rulings, jury instructions and the assessment of punitive damages. We affirm.

Defendants-appellants Florance and Palos Verdes Investment Corporation owned a cattle ranch in Nevada doing business as Bell Brand Ranches, Inc. In April 1979, the ranch manager Segull, because of an insufficiency of hay, contacted plaintiffs-respondents Cheney, seeking to place approximately 800 head of cattle on the Cheneys' feedlot in Gooding, Idaho. Cheney agreed to board the cattle and feed them a chopped hay and potato slurry ration, in return for which Bell Brand would reimburse Cheney the cost of the feed plus ten cents per head daily for boarding the cattle. Cheney was instructed not to vaccinate the cattle and, because the herd was not to be immunized, it was agreed that Cheney was not responsible for any death loss among the herd.[1]

Pursuant to that oral contract, Bell Brand delivered 809 head of cattle to the Cheney feedlot in May 1979. At the delivery time, the cattle were ten to twelve months old and considerable testimony indicated that they were thin and weak for their age. The cattle were started on hay and then later given potatoes, and they appeared to gain weight. In the period from May 31—June 8, 29 of the animals died of a disease called red nose. Routine vaccination would have prevented the disease, which is a recognized danger to cattle under feedlot conditions. Other than among the animals of the defendants-appellants, the occurrence of red nose at the Cheney feedlot was not above that normally expected.

At the end of May, Cheney billed Bell Brand for the boarding and feeding of the cattle. Florance telephoned Cheney in early June to say that he had mailed a check pursuant to the billing and to direct Cheney to ship the cattle to Nevada. Relying upon Florance's assurance of payment in the mail, Cheney shipped the cattle to Nevada.

Cheney's bill for boarding and feeding the cattle was never paid. When Cheney contacted Florance, Florance refused to pay, allegedly stating that he had falsely indicated that the check was in the mail "so I could get the cattle out of your feedlot." Although Florance denies stating that the check was mailed, and denies lying for the purpose of defeating Cheney's possessory lien on the cattle without paying the feeding or boarding, Florance does not dispute

---

1. Segull was evidently discharged from his employment at Bell Brand because of the contract and disputes between the parties. His testimony at trial resulted in much of the evidence being substantially uncontroverted in a situation which ordinarily would be hotly contested.

that nevertheless Cheney's bill has never been paid.

Cheney filed this action for non-payment and for fraud, alleging that Florance's wilful and false misrepresentation was made for the purpose of depriving Cheneys of their lien and that the cattle would not have been released but for the fraud of Florance. Cheney sought the amount owed under the contract, together with interest and punitive damages, costs and attorneys' fees. Defendants-appellants counterclaimed that Cheneys were negligent in caring for the animals, which negligence had allegedly resulted in significant weight loss to the herd and in the death of 28 of the cattle. The jury returned a verdict for the plaintiffs for $27,571 compensatory damages and $25,000 punitive damages and found against the defendants on the counterclaim. Defendants' motions for judgment n.o.v. and for a new trial were denied.

Upon appeal, defendants-appellants assert error in the admission of plaintiffs' business records in evidence; the inquiry into defendant Florance's net worth; the verdict that plaintiffs were not negligent in their care of the cattle; the jury instructions relating to punitive damages; and the amount of punitive damages. Defendants-appellants also assert that plaintiffs were not the real party in interest and hence were not entitled to bring the action.

## I. BUSINESS RECORDS EVIDENCE.

At trial, Cheneys' bookkeeper testified that the potatoes and hay fed to the cattle were weighed and loaded on trucks and that the weights were recorded for defendants' account on a daily feed sheet. It was regular procedure to determine at month end the total weight of potatoes and hay fed to defendants' cattle, which total was then charged at the same rate paid to suppliers of the feed. To that sum was added the "yardage" or boarding fee of ten cents per head per day. Both the daily feed sheets and the end of month summaries were prepared by the bookkeeper. At trial, only the end of month summaries were

offered and admitted, since the daily feed sheets had been destroyed.

Defendants-appellants argue that the records were erroneous since, as presented, they reflected the costs of feeding the admittedly dead animals. However, we deem the error to be, at most, inconsequential and affecting only the weight to be given the evidence by the jury. Defendants-appellants also assert that the monthly billings constitute hearsay and do not fall within the business records exception to the general prohibition of out of court statements. We disagree.

The trial court has broad discretion as to the admission of evidence, including business records, and the exercise of that discretion will not be overturned absent the clear showing of abuse. *Jensen v. Seigel Mobile Homes,* 105 Idaho 189, 668 P.2d 65 (1983); *Curiel v. Mingo,* 100 Idaho 303, 597 P.2d 26 (1979); *Daniel v. Moss,* 93 Idaho 612, 469 P.2d 50 (1970). I.C. § 9–414 codifies the business record exception to the hearsay rule, stating:

"A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to the identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

The legislative intent requires that the business record exception be broadly construed. *Curiel v. Mingo, supra; Daniel v. Moss, supra; John Snowcroft & Sons Co. v. Roselle,* 77 Idaho 142, 289 P.2d 621 (1955); *Henderson v. Allis-Chalmers,* 65 Idaho 570, 149 P.2d 133 (1944).

It was held in *Kelson v. Ahlborn,* 87 Idaho 519, 393 P.2d 578 (1964), that business records possessing a reasonable degree of necessity and trustworthiness ought to be received in evidence, *unless* the trial court, after examining them and hearing their manner of preparation, has serious doubt as to their reliability. *Accord Hammond v.*

*Hammond,* 92 Idaho 623, 448 P.2d 237 (1968).

■ In *Curiel v. Mingo, supra,* a ledger sheet indicating the use of fuel was admitted, although it was not the original source, but rather an accountant's summary, of statements provided regularly by a fuel company. *See also Daniel v. Moss, supra; Hammond v. Hammond, supra.* The account records here were made in the ordinary course of plaintiffs' business and not in preparation for trial and we hold that the trial court did not err in admitting those records.

■ We note, in passing, the evidence offered as to whether the cattle could have consumed as much feed as is reflected in the records, given the herd's alleged meager weight gain and poor condition upon shipping from the feedlot. That testimony was conflicting. A resolution thereof was for the jury and we find no error in the jury's determination of that conflict.

## II. NEGLIGENCE OF PLAINTIFFS.

■ It was defendants' contention at trial that Cheneys, as bailees for hire, had the burden of proving their freedom from negligence when they failed to return the bailed property (the animals which had died) to the owner. *Compton v. Daniels,* 98 Idaho 915, 575 P.2d 1303 (1978); *Lowe v. Park Price Co.,* 95 Idaho 91, 503 P.2d 291 (1972). The trial judge, over the argument of Cheneys, agreed, and he instructed the jury that under such circumstances a presumption of negligence existed. The defendants-appellants argue here that the record does not support a finding that plaintiffs met that burden of proof. We disagree. Negligence or the lack thereof is a matter for determination of a jury, *Nelson v. Hawkes,* 104 Idaho 185, 657 P.2d 482 (1983); *Robinson v. Westover,* 101 Idaho 766, 620 P.2d 1096 (1980), and the record demonstrates ample evidence from which the jury could determine that Cheneys were not negligent.

Cheneys offered sufficient and indeed compelling testimony that cattle in feedlots are more susceptible to disease, specifically to red nose, and that the standard and prudent precaution taken by cattle owners is to vaccinate cattle upon entry into a feedlot. It is not disputed, and indeed Segull, the ranch manager of Bell Brand, testified, that Segull instructed Cheney not to vaccinate the cattle and that the agreement between Cheney and Segull provided that Cheney would not "stand any death loss," because of the greatly increased risk in accepting cattle that were not immunized. As above noted, the evidence supports the conclusion that the cattle died of red nose and that the otherwise existence of red nose in the feedlot was not more than normally expected. This evidence, combined with the dangers of red nose in a feedlot and the instructions of Segull not to immunize, supports the jury verdict that Cheneys had exercised due care and were not negligent.

Although there was evidence on behalf of defendants-appellants that the cattle were "green," *i.e.,* thin, weak and razor-backed, when shipped from the feedlot to the Bell Brand Ranch, Cheneys presented evidence that the cattle were healthy as compared to their condition upon arrival at the feedlot. Cheneys' evidence also indicated that the cattle were adequately fed and cared for in prevention of illness and injury. That evidence, being somewhat in conflict, was for the resolution of the jury and we find no error in the jury's determination thereof.

## III. EVIDENCE OF DEFENDANTS' NET WORTH.

Defendants-appellants assert that the trial court erred in permitting defendant Florance to be questioned regarding his net worth. That questioning is revealed by the record as follows:

"Q. (By Mr. Risch) Would you tell this jury your net worth please?

A. To be totally frank with you, I really don't know. I can give you an approximate idea, but I don't know for sure.

Q. That's what I am asking.

A. It's in excess of one hundred thousand dollars.

Q. What does that consist of?

MR. LEZAMIZ: Your Honor, same objection.

THE COURT: Well, now the Defendant—the witness has answered that he doesn't know, so now I think we have broadened it so I think that counsel is entitled to inquire further. Objection overruled."

A discussion then ensued between Florance and the trial judge wherein Florance vehemently argued he should not be made to answer and that he did not know the value of his assets. Thereafter, Florance testified to owning assets worth approximately three million dollars.

█ It is axiomatic that ordinarily the wealth or lack thereof of a party is irrelevant as to any of the issues to be determined by the fact finder. However, this Court in *Cox v. Stolworthy,* 94 Idaho 683, at 690–91, 496 P.2d 682, at 689–690 (1972), held that evidence of wealth may be admissible in an action seeking punitive damages if the court is cautious to prevent jury passion as a result thereof. It was stated in *Cox:*

"Setting an absolute limit on an award does not satisfy the requirement of providing the trier of the facts with objective criteria which it may use in setting a reasonable award. One guideline was mentioned in *Dwyer v. Libert,* 30 Idaho 576, 167 P. 651 (1917), a libel action. The Court stated that a jury may consider evidence of the wealth of a defendant in deliberations on exemplary damages. Restatement of Torts § 908(2) is in accord with this view. So are *Wetherbee v. United Ins. Co. of Am.,* 18 Cal.App.3d 266, 95 Cal.Rptr. 678 (1971); *Joab, Inc. v. Thrall,* 245 So.2d 291 (Fla.App.1971); *State ex rel. Hall v. Cook,* 400 S.W.2d 39 (Mo.1966); *Hicks v. Herring,* 246 S.C. 429, 144 S.E.2d 151 (1965); *Dalton v. Meister,* 22 Wis.2d 173, 188 N.W.2d 494 (1971).

"We are mindful, however, of the criticism that has been leveled against the use of such evidence of a defendant's wealth. Dissenting opinion of Ailshie, J., in *Summerfield v. Pringle* [65 Idaho 300, 144 P.2d 214 (1943)] *supra;* Hodel, 'Exemplary Damages in Oregon,' 44 Ore.L.R. 175, 189–193. These thoughtful warnings may be utilized. *Evidence as to a defendant's wealth may only be offered for the limited purpose of determining the efficacy of a money judgment in deterring future tortious conduct.* The materiality of such evidence would be questionable, of course, if the evidence at that point had not reasonably established the malicious and wilful character of defendant's conduct. And we add that the absolute limits of an exemplary damages award depend on criteria other than defendant's wealth." (Emphasis added.)

*See also Dwyer v. Libert,* 30 Idaho 576, 167 P. 651 (1917).

█ Since such evidence was admissible, the only remaining question is whether the Court here was sufficiently cautious to prevent such evidence from engendering passion and prejudice by the jury. The trial court during an in-chambers colloquy stated: "I would, though, in making this ruling [that inquiry may be made as to defendant's wealth] and permitting counsel for the plaintiff to inquire, would suggest that it's not necessary to go into any details. And I think one or two general questions can be placed." Hence, the trial court sought to limit the line of questioning and its impact on the jury. We note, however, that it was Florance's own demeanor on the stand which perhaps served to accentuate the issue of his wealth, because of what could be termed evasive and misleading answers to the questions propounded to him. We find no error in the admission of the testimony and no indication that the jury's $25,000 punitive damages award resulted from passion or prejudice engendered by the wealth of defendant Florance.

## IV. PUNITIVE DAMAGES.

Defendants-appellants contend as to the punitive damage issue that the trial court erred in failing to follow the standards first set forth in *Cox v. Stolworthy,* 94 Idaho 683, 496 P.2d 682 (1972), and expanded upon in a later series of decisions regarding the propriety and measure of punitive damages in certain specified categories of cases.

See, e.g., *Jolley v. Puregro Co.,* 94 Idaho 702, 496 P.2d 939 (1972); *Thompson v. Dalton,* 95 Idaho 785, 520 P.2d 240 (1974); *Hatfield v. Max Rouse & Sons Northwest,* 100 Idaho 840, 606 P.2d 944 (1980); *Linscott v. Rainier Nat'l Life Insurance Co.,* 100 Idaho 854, 606 P.2d 958 (1980); *Yacht Club Sales and Service, Inc. v. First Nat'l Bank of North Idaho,* 101 Idaho 852, 623 P.2d 464 (1980). As will be developed *infra,* we hold that the instructions, the verdict, the orders of the trial judge, and the judgment were proper.

■ Defendants-appellants' argument is grounded in the refusal of the trial court to instruct the jury specifically on the holdings of *Cox v. Stolworthy, supra,* and *Linscott v. Rainier, supra,* and in its refusal to reduce the award of punitive damages found by the jury or to grant a new trial. It is argued that $25,000 found as punitive damages resulting from a private contractual dispute, where the compensatory damages were found to be only $27,571, is excessive, not only on the facts of the case but also as a matter of law and can only be attributable to the passion and prejudice of the jury. We disagree. And because we hold that the measure of compensatory damages as outlined in *Cox* is impractical, overly demanding, and inconsistent with law as it relates to other damages, *Cox v. Stolworthy, supra,* is hence erroneous and is hereby in part overruled.

In *Cox,* the court devised a system for determining the amount of punitive damages which might be awarded in any given case. Exemplary damages were divided into three major categories. Category one included deceptive business schemes harmful to the general consuming public, such as false advertising or fraudulent sales tactics (*see, e.g., Boise Dodge, Inc. v. Clark,* 92 Idaho 902, 453 P.2d 551 (1969)). Category two involved endangerment of the physical well-being or health of members of the general public (*see, e.g., Village of Peck v. Denison,* 92 Idaho 747, 450 P.2d 310 (1969)). Category three included private business disputes between contracting parties who are of equal knowledge and bargaining power (*see, e.g., Cox v. Stolworthy, supra*). It was held in *Cox* that a general award of punitive damages was justified in only the first two categories. In cases arising thereafter, the Court attempted to fit various factual situations into one of the three delineated categories. Those efforts were often without success, or if successful, achieved in an unconvincing manner. In *Jolley v. Puregro Co.,* 94 Idaho 702, 496 P.2d 939 (1972), for example, there was involved the conversion of farm machinery by means of a wrongful foreclosure on collateral. Although the case clearly involved a private business dispute, we, for reasons which the unkind or critical might call convenience, held the existence of an element of consumer fraud and classified the matter under category one of the *Cox* scheme. Yet, in *Linscott v. Rainier Nat'l Life Insurance Co.,* 100 Idaho 854, 606 P.2d 958 (1980), we found that an insurance company's failing to make payment on a meritorious claim did not indicate an intent to take advantage of the consuming public under case type one or two, and we rather categorized the matter as a private business dispute under category three of the *Cox* scheme. Hence, punitive damages in *Linscott* were to be limited, and we reduced the punitive damage award of the trial court. As articulately expressed by Bakes, J., in *Jolley v. Puregro Co.:*

"The difficulty with these standards is that they provide no definable objective guidelines for determining what is a reasonable exemplary damages award; the standards appear to serve merely as manipulative vehicles by which the reviewing court can substitute its viscerally-dictated judgment for that of the trier of fact. *See generally Summerfield v. Pringle,* 65 Idaho 300, 316 et seq., 144 P.2d 214, 222 et seq. (1943) (J. Ailshie, dissenting); *Note,* 'Exemplary Damages in the Law of Torts,' 70 Harv.L.R. 517, 529–531 (1957)." *Jolley v. Puregro Co., supra,* 94 Idaho at 709, 496 P.2d at 946.

*See also Thompson v. Dalton, supra.*

We now hold that attempting to fit infinitely varied fact situations involving puni-

tive damages into the overly simplified and restricted categories set forth in *Cox* has been demonstrated to be at best unworkable and at worst impossible. In both *Linscott, supra,* and *Thompson v. Dalton, supra,* we noted the possibility of "other similar situations in which aggravating and dire circumstances necessitate the departure from the general rule of exemplary damages in *Cox v. Stolworthy.*" We now take the final step of overruling and discarding the *Cox* approach of forcing all fact situations into one of the three categories set forth in *Cox.*

We hold that punitive damage awards are in the first instance a jury decision, subject to the trial court's authority to modify or overturn that jury verdict as a matter of law. Such is no novel approach to the appellate treatment of a damage issue. *See Boise Dodge, supra; Checketts v. Bowman,* 70 Idaho 463, 220 P.2d 682 (1950); *Horn v. Boise City Canal Co.,* 7 Idaho 640, 65 P. 145 (1901); I.R.C.P. 59(a)(5). We have consistently held that "[p]unitive damages are by their very nature incapable of definite ascertainment and cannot be governed or measured by any precise standards." *Cox v. Stolworthy, supra,* 94 Idaho at 688, 496 P.2d at 687; *Prudential Federal Savings & Loan Ass'n v. Johnson,* 93 Idaho 850, 476 P.2d 786 (1970). "Thus, the true basis for an award of one amount of punitive damages as opposed to another amount lies in an overall appraisal of the circumstances of the case." *Boise Dodge, supra,* 92 Idaho at 908, 453 P.2d at 557.

We deem that an award for exemplary damages should be left first to the determination of the trier of the fact. A judge or jury should not be hampered with strictly construed schemes or rules which inappropriately require the forcing of many-faceted fact patterns into neat pigeonholes or compartments. Such deference to the trial court is consistent with the appellate overview of compensatory damages. It is clear that a trial judge exercises authority over jury awards of compensatory damages by acting substantially as a thirteenth juror. *Deshazer v. Thompkins,* 93

Idaho 267, 460 P.2d 402 (1969); *Blaine v. Byers,* 91 Idaho 665, 429 P.2d 397 (1967). The trial judge has authority to order a new trial if in his judgment damages are excessive or inadequate. *Dinneen v. Finch,* 100 Idaho 620, 603 P.2d 575 (1979); *Fignani v. City of Lewiston,* 94 Idaho 196, 484 P.2d 1036 (1971); *Warren v. Eshelman,* 88 Idaho 496, 401 P.2d 539 (1965); *Checketts v. Bowman,* 70 Idaho 463, 220 P.2d 682 (1950); *Luther v. First Bank of Troy,* 64 Idaho 416, 133 P.2d 717 (1943). Alternatively, a trial judge may peremptorily reduce an excessive jury award, order remittiturs of damages, or condition a denial of new trial on the acceptance of an additur or remittitur. *Nichols v. Sonneman,* 91 Idaho 199, 418 P.2d 562 (1966); *McCandless v. Kramer,* 76 Idaho 516, 286 P.2d 334 (1955); *Checketts v. Bowman, supra.* Cf. *Ryals v. Broadbent Dev. Co.,* 98 Idaho 392, 565 P.2d 982 (1977). Since trial judges have traditionally been granted wide discretion in reviewing jury awards in the area of compensatory damages, it is entirely appropriate that we entrust to the trial judge a similar authority and discretion in the matter of punitive damages. As stated in *Dinneen v. Finch,* 100 Idaho 620, 624, 603 P.2d 575, 579 (1979), quoting *Mendenhall v. MacGregor Triangle Co.,* 83 Idaho 145, 358 P.2d 860 (1961); *Checketts v. Bowman,* 70 Idaho 463, 220 P.2d 682 (1950); and *Bond v. United Railroads,* 159 Cal. 270, 113 P. 366 (1911):

> "The remedy for excessive verdicts rests largely with the trial judge, *whose duty it is to carefully weigh the evidence* and not allow a verdict to stand for a greater amount than the evidence will reasonably justify. (Emphasis in original.)
>
>   *   *   *   *   *   *
>
> "Practically, the trial court must bear the whole responsibility in every case."

While no concrete formula for an award of punitive damages will control, the discretion of the trial judge will continue to be exercised within the general advisory guidelines laid down by this Court in the past. Mindful of the purpose of punitive damage awards, we note that they are

not favored in the law and therefore should be awarded only in the most unusual and compelling circumstances. They are to be awarded cautiously and within narrow limits. *Hatfield v. Max Rouse & Sons Northwest, supra; Jolley v. Puregro, supra. See also Yacht Club Sales & Service, Inc., supra; Jolley, supra; Linscott, supra; Cox, supra,* as holding that the policy behind punitive damages is deterrence rather than punishment. An award of punitive damages will be sustained on appeal only when it is shown that the defendant acted in a manner that was "an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or disregard for its likely consequences." *Hatfield v. Max Rouse & Sons Northwest, supra,* 100 Idaho at 851, 606 P.2d at 955. *See Linscott, supra.* The justification for punitive damages must be that the defendant acted with an extremely harmful state of mind, whether that state be termed "malice, oppression, fraud or gross negligence" (*Morrison v. Quality Produce, Inc.,* 92 Idaho 448, 444 P.2d 409 (1968)); "malice, oppression, wantonness" (*Klam v. Koppel,* 63 Idaho 171, 118 P.2d 729 (1941)); or simply "deliberate or willful" (*White v. Doney,* 82 Idaho 217, 351 P.2d 380 (1960)). *See generally, Linscott, supra,* 100 Idaho at 858, 606 P.2d at 962; *Thompson v. Dalton,* 95 Idaho 785, 788, 520 P.2d 240, 243 (1974).

Although *Boise Dodge, supra,* involved a "far-flung fraudulent scheme, systematically conducted for profit," the language therein quoted from *Walker v. Shelton,* 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961), appears highly appropriate in a case such as the one at bar:

> "Exemplary damages are more likely to serve their desired purpose of deterring similar conduct in a fraud case, such as that before us, than in any other area of tort. One who acts out of anger or hate, for instance, in committing assault or libel, is not likely to be deterred by the fear of punitive damages. On the other hand, those who deliberately and cooly engage in a far-flung fraudulent scheme, systematically conducted for profit, are very much more likely to pause and consider the consequences if they have to pay more than the actual loss suffered by an individual plaintiff. An occasional award of compensatory damages against such parties would have little deterrent effect. A judgment simply for compensatory damages would require the offender to do no more than return the money which he had taken from the plaintiff. In the calculation of his expected profits, the wrongdoer is likely to allow for a certain amount of money which will have to be returned to those victims who object too vigorously, and he will be perfectly content to bear the additional cost of litigation as the price for continuing his illicit business. It stands to reason that the chances of deterring him are materially increased by subjecting him to the payment of punitive damages." *Boise Dodge, supra,* 92 Idaho at 909, 453 P.2d at 558.

Since we hold that the issue of an alleged excessive award of punitive damages is largely within the discretion of the trial judge, we now examine whether that discretion was properly exercised in the instant case, wherein the trial judge refused to grant a judgment n.o.v. or a new trial. We hold that sufficient evidence was placed before the jury to raise the questions of defendants' malice and of whether an award of punitive damages would serve as a deterrent to similar future conduct. The jury could have reasonably determined that Florance wantonly and maliciously deprived Cheneys of their possessory lien on the cattle, in disregard of the rights of the Cheneys and in order to be unjustly enriched by the Cheneys' labor. The jury could have concluded that Florance deliberately and fraudulently misrepresented to Cheney that payment had been made.

Cheneys have alleged as error the trial court's refusal to admit evidence of other private contractual dealings of defendants-appellants, which evidence they argue would help them to satisfy the category one or category two requirements of *Cox, supra.* In view of our decision herein, we find it

unnecessary to resolve that question. We have examined defendants-appellants' other assertions of error and find them to be without merit.

· The judgment of the trial court is affirmed. Costs to respondents. No attorneys' fees allowed.

BISTLINE and HUNTLEY, JJ., concur.

DONALDSON, Chief Justice, specially concurring.

The awarding of punitive damages has been a troublesome area of the law for this Court to consider with any consistency. However, the majority opinion will only succeed if the following occurs:

First, if the trial court in using its discretion heeds the majority's admonitions that (1) punitive damages are not favored in law and should be awarded *only* in the most unusual and compelling circumstances, (2) punitive damages are to be considered only as a deterrent to the wrongdoer and other similar offenders and not as a punishment, and (3) the complained of act involves malice, oppression or fraud.

Second, if the jury or court findings are supported by a detailed and complete record so as to allow an adequate review by an appellate court.

Third, if the appellate court refrains from acting as a fact finder and from substituting its judgment for that of the trial court in the proper exercise of its discretion. ·

Having expressed these caveats, I concur in the majority opinion.

BISTLINE, Justice, specially concurring.

As with other practicing attorneys in 1972, I was far from being an ardent admirer of those companion cases, *Cox v. Stolworthy* and *Jolley v. Puregro.* In the ensuing years the appellate disposition of cases where punitive damages had been awarded only served to greatly enhance my disenchantment. The doctrine of *Cox v. Stolworthy* and *Jolley v. Puregro,* totally unworkable as Justice Shepard points out, while it has been plaguing Idaho jurisprudence for over ten years, has not met with

any acclaim elsewhere. According to my volume of Shepard's citations, no other court in any of the other 49 states has ever mentioned that doctrine, let alone adopted it. *Cox v. Stolworthy* was given a footnote mention in a 1976 Michigan Law Review article on punitive damages, Vol. 74 at p. 1286: "Punitive damages are widely considered to be useful in preventing wrongdoing from being profitable for the malefactor. See, e.g., *Cox v. Stolworthy,* 94 Idaho 683, 691, 496 P.2d 682, 690 (1972) ('Clearly in such cases the award of punitive damages should aim at making the cost of such repetitive anti-social conduct uneconomical')."

Unfortunately, that single statement has not been applied to cases coming before the very court which uttered it, of which *Hatfield, Rainier, Yacht Club,* and *Massey-Ferguson Credit Corporation v. Peterson,* 102 Idaho 111, 626 P.2d 767 (1980), were prime examples.

*Yacht Club Sales and Service, Inc. v. The Idaho First National Bank of North Idaho,* 101 Idaho 852, 623 P.2d 464 (1980), was the third in a string of three 1980 opinions which reversed district court judgments awarding punitive damages. These three cases emanated from the First Judicial District in contested trials which were presided over by three of Idaho's outstanding district judges—with distinguished service both on the district bench and this bench totalling over fifty years. *Hatfield v. Max Rouse & Sons Northwest,* 100 Idaho 840, 606 P.2d 944 (1980), rehearing denied without opinion March 17, 1980, too, was a jury case where the trial court, as in *Yacht Club,* reviewed the record on a motion for new trial and, finding no error, upheld the jury verdict. *Linscott v. Rainier National Life Insurance Company,* 100 Idaho 854, 606 P.2d 958 (1980), rehearing denied without opinion March 17, 1980, was tried to the court without a jury.

In *Yacht Club* I mentioned that this abrupt change in the law had its genesis in *Cox v. Stolworthy,* 94 Idaho 683, 496 P.2d 682 (1972). The author of that opinion was also the author of *Yacht Club, Hatfield,* and

*Linscott.* Unlike the process for promulgation of rules of procedure, where committees of attorneys participate in discussion and drafting, *Cox v. Stolworthy*'s drastic change in the law was made with absolutely no input whatever from the litigants there involved, from the bar, or from the public. There was no clamor for the Court's activism. The appellant in *Cox v. Stolworthy,* 94 Idaho 683, 496 P.2d 682 (1972), complained only that the district judge there had affirmed a jury verdict which imposed $5,000 punitive damages for the willful and malicious bulldozing out of a private access roadway. Issuing a lengthy opinion which completely rewrote the law of punitive damages, the Court lowered the assessment, but failed to explain how its $2,000 figure was more appropriate than the $5,000 damages assessed by the jury and upheld by the trial court. It was a little case. But as Chief Justice Burger remarked in addressing the American Law Institute in Washington, D.C. June 10, 1980, "[c]hanges in the law come silently, and, like a glacier, the movement is almost imperceptible, often first emerging in an obscure case that goes unnoticed."

*Jolley v. Puregro Co.,* 94 Idaho 702, 496 P.2d 939 (1972), was released but seven days after the release of *Cox v. Stolworthy,* in point of time considerably before the remittitur had gone down in the latter.

In *Jolley v. Puregro* another able trial judge assessed $5,000 as punitive damages for the conversion of farm equipment. The trial court's findings of malicious conduct were in the Court's opinion upheld. That should have been the end of it, but it was not, and the case served as a vehicle to endorse the newly espoused doctrine of *Cox v. Stolworthy,* notwithstanding that the Court did not in *Jolley v. Puregro* reduce the award of punitive damages which Judge Dunlap had properly fixed as appropriate. The Court, without any evidence upon which to act, apparently pulled out of a hat the sum of $2,500 as attorney fees and allocated the other $2,500 as the not unreasonable deterrent for the defendant corporation's taking ways. This, it was said, was permissible as being "under the general rule in *Cox v. Stolworthy,*" which rule was then less than a week old. The defendant, however, knew only that the exemplary damages of $5,000 were left standing. The decision truly served no purpose whatever but to advance the doctrine of *Cox v. Stolworthy.* Not readily apparent because of the heavy merely repetitious verbage lifted from *Cox v. Stolworthy,* the Court thus ended up *affirming* $5,000 punitive damages and compensatory damages of $150.

In *Hatfield, Linscott, Yacht Club,* and also in *Massey-Ferguson,* four most able trial judges held punitive damages allowable and either affirmed a jury award as to amount, or set the amount. Each was reversed, with every reversal occurring in an opinion authored by one or the other of the authors of *Cox v. Stolworthy* and *Jolley v. Puregro.* A review of those cases—as distinguished from a review of the opinions in those cases—discloses that those trial judges were not only entirely correct, but attempted to comply with what they thought the authors of *Cox v. Stolworthy* and *Jolley v. Puregro* had in mind. In *Yacht Club,* it is true that the award of punitive damages was a main challenge on appeal, and, although the award did not come under the Court's direct assault, a bare majority of the Court managed to find error in the award of the underlying compensatory damages, which was said to necessitate a new trial on punitive damages as well.

In *Massey-Ferguson* another able trial judge awarded *modest* punitive damages. Again, as in *Yacht Club,* the trial court was reversed with the punitive damages again falling along with the reversal of the general damage award. The main premise of the Court's opinion was that the trial court failed to perceive that Massey-Ferguson Finance Co. at all times had the right to possession of the collateral upon default, and therefore could do no legal wrong in breaking a padlock and helping itself to collateral the title to which was in Peterson, even trespassing to do so.

The majority in *Massey-Ferguson* simply retried that issue. Notwithstanding that it did hold Peterson entitled to nominal compensatory damages (the $150 compensatory damages in *Jolley v. Puregro* was *nominal*), it wiped out the punitive damages.

Justice Shepard, in authoring today's opinion for the Court, mentions that the Court in *Linscott* "reduced" the punitive damages. Again the opinion was authored by the author and proponent of the *Cox v. Stolworthy* doctrine. Justice Shepard did not sit on the case (nor did Justices Donaldson, Bakes, or myself) and has no reason to comprehend just how untenable that *Linscott* opinion was, although it did, reluctantly, come to the conclusion that punitive damages were allowable, but nevertheless washed the assessment away. Notwithstanding that Judge Cogswell had allowed $1,800 in attorney's fees under the provisions of I.C. § 41–1839—it being beyond dispute that the Linscotts were entitled to attorney's fees—*Rainier did not,* on appeal, assign as error the award of $1,800 attorney's fees. So, such being the actual factual state of affairs, what did the Supreme Court do but take them away and then reinstate the same in the name of *Cox v. Stolworthy* punitives! *Linscott,* 100 Idaho at 862, 606 P.2d at 966. It was said that "the $1,800 should have been awarded as punitive damages rather than under I.C. § 41–1849 . . . ." This borders on the ludicrous. Had the Linscotts not even asked for punitives, they were absolutely entitled to their attorney's fees. Adding insult to injury, after Judge Cogswell had held that *Rainier* should be assessed punitive damages because of conduct exactly that described in *Linscott,* 100 Idaho at 857, there quoting *Unfried v. Libert,* 20 Idaho 708, 728, 119 P. 885, 891 (1911), the opinion authored by Justice McFadden agreed that an award was justified:

> "In this case the trier of fact was justified in concluding that the Linscotts had shown that Rainier Life's refusal to make payments was totally unjustified."
> 100 Idaho at 860, 606 P.2d at 964.
> "The evidence therefore shows, first, that Rainier Life's refusal to honor the policies was totally unjustified; and, second, that even had it proved that Laurelie had epilepsy and that she had not disclosed this on the application forms, it still attempted to go further than it could have by claiming to rescind the policies. This evidence *suggests* that the insurance company was acting in bad faith. There is merit in the observation by counsel for the Linscotts in their brief that '[t]he company has everything to gain by fighting a bad fight and nothing to lose but interest on its just obligation.' Under these facts the trial judge was justified in making an award of punitive damages."
> 100 Idaho at 861, 606 P.2d at 965 (emphasis added).

Judge Cogswell's findings, however, were considerably stronger than the Supreme Court's finding of a "suggestion of bad faith. His conclusions applied to *his* facts clearly justified the rather modest award of punitive damages, and demonstrate that he acted within the guidelines of *Jolley v. Puregro* and *Cox v. Stolworthy:*

> ## "ARE PLAINTIFFS ENTITLED TO PUNITIVE DAMAGES
>
> "The Idaho case of *Jolley vs. Puregro Company,* 94 Ida. 702, [496 P.2d 939] involved acts by the agent of the defendant company in wrongfully repossessing certain machinery belonging to the plaintiff. The Idaho Supreme Court re-examined the law in Idaho on punitive damages and made the following pronouncements which are pertinent to this action.
>
> " 'As we understand the rule of exemplary or punitive damages, they cannot be recovered unless the evidence shows clearly that the action of the wrongdoer is wanton, malicious, or gross and outrageous, or where the facts are such as to imply malice and oppression, in which case the law authorizes the court to allow a sum of money as punishment to the wrongdoer for the injury done.
>
> " 'From the evidence introduced in the case at bar, it is manifest that appel-

lant's conduct typified the conscious and wilful disregard of respondent's rights which justifies the imposition of an exemplary damages award. The district court specifically found that appellant's agents' acts were deliberate, willful, malicious, and intentional and for the sole purpose of harassing respondent. The court further observed that appellant ignored explicit instructions not to take the equipment belonging to respondent. These findings are substantiated by competent evidence, and will not be disturbed on appeal.'

"It is the finding of this Court that defendant acted in a conscious and willful disregard of plaintiffs' rights and that their action was gross and outrageous justifying the Court in awarding punitive damages.

"The evidence is without conflict that:

"1. The defendant sold the policies of insurance to Laurelie Linscott for a valuable consideration.

"2. Laurelie Linscott made no misrepresentations in the policy application concerning her health.

"3. The policy was represented to the plaintiffs and to Laurelie by the defendant's agent as a policy covering all pre-existing conditions six months after issuance.

"4. After the claims were filed by the plaintiffs, the defendant refused payment alleging misrepresentation by Laurelie Linscott. The refusal continued even in the face of all of the medical advice in this case that Laurelie Linscott was not suffering from epilepsy per se, and that she had accurately reflected her health condition in the insurance application.

"5. *There is a complete lack of evidence in the case that would in any manner justify the defendant's position of nonpayment of these claims.*

"6. The only conclusion that the Court can make in view of the complete void in the evidence supporting defendant's position is that *the defendant's conduct was a conscious, willful and deliberate disregard of the plaintiffs' rights under the insur-ance contract and was oppressive and grossly outrageous.*

## "AMOUNT OF PUNITIVE DAMAGES

"Again in *Jolley vs. Puregro* (supra) our Idaho Supreme Court re-examined the main purpose of punitive damages and commented as follows:

" 'As this court noted in *Cox vs. Stolworthy,* supra, other authorities recognize that the predominant purpose of exemplary damages is to deter the defendant and others similarly situated from indulging in comparable conduct in the future. Any vindictive or vengeful punishment aspect of an exemplary damages award is de-emphasized by this line of authority. *Cox v. Stolworthy,* supra; See C. Morris, Punitive Damages in Tort Cases, 44 Harv.L.R. 1173 (1931). We prefer to accentuate those cases which define the purpose of exemplary damages as a deterrent to the defendant and others from engaging in similar conduct in the future. We concede that any exemplary damages assessed against a defendant will appear to him to be punishment. However, we feel that the courts in these civil cases should be motivated primarily by a purpose of deterrence and not be a purpose of punishment. In other words, the assessment of exemplary damages should be prompted by the court's or jury's desire to assure, to the extent possible via the imposition of a monetary penalty, that similar conduct does not occur in the future. Punishment, per se, should be left to the criminal law. D. Hodel, supra, at 178–82.

" 'Being mindful of the public purpose to be served by an award of exemplary damages, it is necessary to decide, in terms of a monetary award, how best to implement or advance such purposes. It is necessary to determine what size award will best accomplish the purposes of deterrence and to some extent punishment.'

"The Court in *Jolley* again examined *Cox vs. Stolworthy,* 94 Ida. 683, [496 P.2d

682] as to standards that should be used in arriving at punitive damages which are 'logically ordered, legally evaluated, and rationally judged.'

"In *Stolworthy* the anti-social conduct involved a non-violent trespass on land affecting *only two individuals.* Attorneys fees, expert witness fees, and reimbursement to the plaintiff for time lost occasioned by the defendant's wrong were the main items considered in awarding punitive damages.

"However, the Court expanded the criteria in assessing punitive damages where it is necessary to remove the profit motive from the defendant's business practice and to make it uneconomical for a defendant and for others similarly situated to engage in oppressive practices. (*See Boise Dodge vs. Clark,* 92 Ida. 902 [453 P.2d 551]).

"It is the Court's opinion that the acts of the defendant in this case unjustifiably denying recovery on valid insurance policies falls within the latter category and that an award of punitive damages over and above those allowed under *Cox vs. Stolworthy* is justified.

"It is the Court's opinion that the sum of .... $20,000 is awarded to the plaintiff as punitive damages to deter the business practices of the defendant in settling insurance claims and in order to deter other insurance companies from similar conduct."

The trial bar has found it difficult indeed to understand how four respected district judges who sat with Justice McFadden in *Linscott* were persuaded that their esteemed brother district judge did not know what he was doing. One might surmise that it was perhaps because the four district judges relied on the author of the opinion to peruse the record. And it is true that the Court rules still require only three copies of the appeal record—all of which are ordinarily kept here in the Supreme Court building. In this day of versatile photocopy machines there is no longer the reason for requiring only three copies—which so far as

I can ascertain harkens back to fifty years ago when there were only three justices.

Justice Shepard in today's opinion also mentions *Hatfield v. Max Rouse & Sons* for a proposition therein stated that punitive damages "will be sustained on appeal only when it is shown that the defendant acted in a manner that was performed by the defendant with an understanding of or disregard for its likely consequences." No one should question that statement, but on the *Hatfield* appeal it was totally ignored or circumvented.

The jury in *Hatfield* found that in that case there was just that type of conduct and assessed punitive damages. Judge Towles presided at the trial, and in passing on post-judgment motions stated "that the verdict of the jury was in accord with the evidence presented and the amount of punitive damages is not disproportionate to the actual damages found by the jury." Memorandum Decision and Order, R., p. 194. Thus, it is seen that the jury in *Hatfield* and the judge both found the type of conduct for which Justice Shepard today cites *Hatfield.*

Simply put, Justice McFadden sitting with the four district judges who adopted his views in *Linscott,* "found" differently.

The *Hatfield* opinion in Part IV, after reciting the *Cox v. Stolworthy* and *Jolley v. Puregro* littany, does at least come fairly close to stating the grounds upon which the jury assessed, and the trial judge upheld, punitive damages:

"In this case respondent argues that the award of punitive damages could have been based on one or all of three courses of conduct: (1) Rouse's failure to follow Koyle's instructions that David's skidders were not to be sold for less than $25,000; (2) its advice to Koyle that he should assure the minimum price himself by having his son-in-law bid on the skidders; and (3) the actions of Rouse's attorney in issuing the proceeds of the sale in a multiple-payee check with release endorsement which had the effect of pitting father against son, forcing David to choose between compromising his own

claim and delaying his fater's receipt of the funds due him."

100 Idaho at 852, 606 P.2d at 956.

Of extreme significance is the above excerpt's omission to note that from the time of the sale in February of 1975 until after the trial and the entry of judgment against it, Max Rouse & Sons held *all* of the money which it had received from Zimmerly for David Hatfield's wrongfully sold skidder. Obviously it must have been deemed of no moment in the *Hatfield* court's view that an agent was wrongfully withholding money belonging to his principal. Such conduct would in the minds of most people be outrageous. In some minds it would amount to embezzlement, but the *Hatfield* court was not impressed enough to give any mention to such a gross conduct of a principal to his fiduciary. Only after the jury's verdict and after entry of judgment did Max Rouse & Sons hand over to David Hatfield the $12,000 (less commission) which it wrongfully detained for over one year. And, whether embezzlement or not, evidence presented to the jury showed that from the day of the sale until after trial, verdict, and judgment, Max Rouse & Sons withheld David Hatfield's money as leverage to force him to forego his claim against it for selling below his reserved price—which most people of reason would see as outrageous conduct. Having so stated some, but not that item, of the Max Rouse & Sons conduct which both provoked and necessitated the lawsuit, the opinion proceeds:

> "The question remains whether the plaintiff was injured as a result of an 'extreme deviation from reasonable standards of conduct' which is performed intentionally or recklessly. *Id.* 100 Idaho at 858, 606 P.2d at 962. *A glance at the cases discussed above makes it immediately clear that this breach was not a sufficiently extreme deviation from reasonable standards of conduct to merit an award of punitive damages."*

100 Idaho at 852, 606 P.2d at 956 (emphasis added).

That "glance" which the *Hatfield* court took was without doubt the shortest glance in history. A jury who saw and heard the witnesses thought otherwise. A district judge who saw and heard the witnesses thought otherwise.

Then comes the clincher, one which should demonstrate for all time that the person who creates a doctrine and undoubtedly believes in it, may become obsessed with it to the point of no recall. The opinion goes on to say: "Nor does the breach appear to have been intentional or reckless." Whether or not this was so was for the jury to determine in the first instance, and the district judge in the second—but not for an appellate court on review. The rule has always been that it is the jury who will believe or disbelieve a witness. Here the witness was Harold Rouse, a man who none of the *Hatfield* court ever saw. Here is what the *Hatfield* court said in relieving Max Rouse & Sons from the assessment of punitive damages:

> "Nor does the breach appear to have been intentional or reckless. <u>Harold Rouse testified that he believed that he had no power as auctioneer to refuse to accept a bid which was below a stated minimum, and testified that his standard operating procedure was to refuse to sell items on which a minimum bid was set. That is, he believed his auction sales were all 'without reserve,' and that once a legitimate bid was received he was bound to accept it.</u> He was thus operating under a mistake of law. But there is no evidence that he acted intentionally for the purpose of causing a loss to David Hatfield—the evidence in fact is to the contrary. He testified that the sale of lots was done very rapidly, requiring split-second decisions. And everyone agreed that John Poysky was 'nice' after the sale and tried to convince Zimmerly not to take the skidder, despite his clear right to do so. I.C. § 28-2-328(2). Carl Wright, another Rouse employee, also tried to 'sweet talk' Zimmerly."

100 Idaho at 852-53, 606 P.2d at 956-57 (footnote omitted) (emphasis added).

Harold Rouse said a lot of things and the jury didn't believe him. Apparently the

*Hatfield* court, who never saw the man or heard him testify, thought he was a mighty fine man who accidentally sold a $26,000 skidder for $12,000 immediately after a like skidder offered at $13,500 did not receive any bid and was withdrawn by Harold Rouse's use of an "air" bid. Above underlined is the testimony of a professional auctioneer and the main owner of the defendant corporation Max Rouse & Sons, Northwestern, a Nevada corporation, and also, as the record shows, the owner of other auction companies. It is not strange that the jury might not have believed the testimony which the *Hatfield* court utilized in order to explain its throwing out the punitive damages. That the jury did not believe Harold Rouse is not surprising where the *Hatfield* court (buried in a footnote) does provide this illuminating statement:

"There can be no doubt, then, that this was a sale with reserve, and that Rouse could have assured that David's skidder did not sell below the stated minimum by withdrawing it at any time before completing its sale."

100 Idaho at 853 n. 7, 606 P.2d at 967 n. 7. How any appellate court can concede that admission in its opinion, albeit by footnote, and then proceed to exonerate the auctioneer on the appellate court's judgment as to his credibility is simply beyond reason, and moreover, frightening. The same footnote also admits that the Max Rouse & Sons brochure advertised the sale as being one with reserve. The footnote even goes so far as to point to I.C. § 28–2–328(2) which reads as follows:

" [An auction] sale is with reserve unless the goods are in explicit terms put up without reserve. In an auction with reserve the auctioneer may withdraw the goods at any time until he announces completion of the sale.' "

100 Idaho at 853 n. 7, 606 P.2d at 957 n. 7. This is not *just* Idaho law, but Idaho law which is part of the U.C.C.; my recollection is that forty-nine states have adopted it, and it would be difficult to imagine a professional auctioneer who on the witness stand can honestly say that "he believed his auction sales were all 'without reserve,' and that once a legitimate bid was received he was bound to accept it." The author of the *Hatfield* opinion not only could imagine such a person, but thought that *it* had the right to believe such testimony, even though the jury obviously did not. Would anyone? The *Hatfield* court also read the record carelessly. The opinion reads:

"As a result a conversation took place about fifteen minutes before the sale, in which the skidders were discussed. Koyle and his son-in-law, Frank Hanks, who was also in the logging business, and Poysky and Harold Rouse took part.

"What was actually said during the conversation was disputed by the parties at trial. Koyle maintains that he told Harold Rouse and Poysky that he required a minimum price on all four of the skidders—$30,000 on each of his own and $26,000 on each of David's. According to Koyle, John Poysky assured him that there were bidders who would offer as much as $32,000 for the skidders. Both Harold Rouse and John Poysky testified that Koyle expressed concern about the skidder market, and was worried about the skidders' sale price. Poysky testified that he advised Koyle that he should protect his skidders by having his son-in-law Hanks bid on them for him until they reached the minimum sale price. Neither Harold Rouse nor Poysky testified that Koyle explicitly agreed to such a scheme but both say they understood after the conversation that this method would be used by Koyle to protect his skidders."

100 Idaho at 842, 606 P.2d at 946.

There was indeed a conversation, but the *Hatfield* court remained oblivious to the fact that any dispute was resolved against Max Rouse & Sons, and the jury was the judge of the credibility of the witnesses. A strong witness for David Hatfield, in an indirect manner, was Ronald B. Labowe, corporate counsel for the auction company defendant. With Koyle Hatfield on the stand, these questions were asked and these answers given:

"Q. Mr. Hatfield I am going to hand you this exhibit, Plaintiff's Exhibit 10, and ask you to read, read aloud these first three lines, which is a complete sentence?

"A. *'Prior to the auction Koyle and David Hatfield told my client that certain pieces of equipment should not be sold unless they received a certain minimum bid from the outside parties.'*

"Q. All right. The question, Mr. Hatfield, is, that's Mr. Labowe's letter, his statement, is his statement true?

"A. Yes.

"Q. Is any part in error where it says from Koyle and David?

"A. Well, I acted in David's behalf.

"Q. And you are the one that had the conversation?

"A. Yes."

Exhibit 10, letter from Mr. Labowe.

It would seem beyond any dispute that the corporation officers were advised of minimum bid prices on the four skidders. Koyle Hatfield told the jury the prices on which he instructed the auction corporation:

"Q. And what is the instruction that Mr. Labowe is talking about there on the four skidders, what did you tell them?

"A. Well, I told them then and several other times—

"Q. Just then. See, I don't want you to volunteer because that makes Mr. Reed have to object. You have to fix times and places Mr. Hatfield and we are just talking about this time right now?

"A. I told him then I was worried about the skidders and that I—

"Q. I didn't ask you about being worried. I may ask you that later, but I want you to answer my question, what did you tell him the minimum prices were on those four skidders?

"A. I told him the minimum price on my two skidders was $30,000 and the minimum prices on David's was $26,000."

Such was on direct examination. On cross-examination it was suggested that there had been more conversation than the set-

ting of the minimum reserve price, but the cross-examination changed nothing as to what Koyle Hatfield testified to as to being the pre-auction conversation alluded to in the excerpt from the Court's opinion above set forth. Koyle Hatfield was returned to the stand *after* the defendant corporation had put on its case. On rebuttal he testified:

"Q. Mr. Hatfield I have only brought you back to the stand in connection with one thing that was brought up by the defendants in their case and that's this matter of their testimony that John Poysky said that you were there when they told you that you should have Frank Hanks, shill, so to speak, to shill the sale?

"MR. REED: I object to the use of the word shill when the testimony of the witness was protect.

"Q. Protect. Protect the bidding or whatever you want to call it. I'll use the word protect. Now, my question. Let me do it over again. First, we know you had conversation where you talked about the minimum bid and we are not going back into that. Now, this new matter that they brought up that we covered with Frank Hanks but didn't cover with you, they are saying, they were both there and John Poysky talked to you about having Frank bid, just use the word bid, on the skidders that were coming up, yours and David's, that's what I'm asking you now. My question is simply this, *did that happen*?

"A. *No, it did not.*"

Keeping in mind that the Court's opinion stated that the pre-auction conversation was amongst Koyle Hatfield, Frank Hanks, John Poysky and Harold Rouse, and having just seen that Koyle Hatfield flat-out contradicted the testimony of Poysky and Rouse[1] as to the latter two having been advised that Frank Hanks should "protect" the skidders, what did Frank Hanks testify to—no mention of his testimony of the conversation appearing in the *Hatfield* opinion:

1. Pertinent portions of the testimony of Rouse and Poysky are appended.

"Q. When did you go to the auction sale, Mr. Hanks, and how did you go?

"A. Well, I went by myself that morning in a pickup, the one I drove down there. I can't even remember what the date was for sure.

"Q. When you got there did you see any of the Hatfields?

"A. Yeah, Koyle was there. It was a pretty cold morning, and he was starting the equipment, and I went around and helped him start some of the rigs.

"Q. Did you meet any of the personnel for Max Rouse and Sons, Northwest that morning?

"A. Well, the only thing that I can recall is that when Koyle and I went in the office and I had my letter of credit and Koyle said, 'This here is my son-in-law, he wants to buy a skidder and he has this letter of credit what do you do with that?' And he took the letter and I got signed up and I got my number and that's all that I can recall.

"Q. Now, what about the events of that sale. You have already told the jury you bought the two skidders, the two Koyle skidders that day. Can you tell us just how that happened as you recollect it?

"A. I had in mind to buy one skidder when I went to the sale and that's about all the financing I obtained. I didn't care whether I bought one of David's skidders or one of Koyle's. Koyle's skidders were a little bit newer skidders and I felt like I would buy whichever one was the best buy.

. . . .

"Q. You were here when Mr. Reed and I read the testimony of Mr. Poysky. Did you hear that? I was asking the questions and Mr. Reed was reading answers for Mr. Poysky?

"A. Yes.

"Q. And did you, sitting in the back, to direct your attention to my question, did you hear that part about where Mr. Poysky was talking about you buying them back or bidding in or something for Koyle Hatfield?

"A. Yes.

"Q. All right. Did Koyle Hatfield give you any direction or instruction or request to bid anything in for him at that sale?

"A. No, he didn't. He didn't even realize that I had bought the skidders until the sale was about over, I don't believe.

"Q. How did you know that? Where was he when this sale was going on?

"A. Well, as I remember, he was driving the pickup that the auctioneer was auctioning from.

"Q. Here's Koyle Hatfield in the cab driving this truck, and where is the auctioneer, Mr. Rouse?

"A. He's in the back of the pickup.

"Q. On the bed?

"A. Yes.

"Q. And where are all the buyers, the prospective buyers?

"A. Well, gathered around the front of the auctioneer and around the equipment.

. . . .

"Q. You went to an auction sale. You were hoping to buy some equipment if the price was right, is that correct?

"A. That's right.

"Q. And you expected that if you were the successful bidder, to take that equipment, is that right?

"A. Yeah, that's right.

"Q. And you felt that when you bought these two skidders that you got a bargain, they were worth what you were paying for them?

"A. Yeah, I felt it was a good price.

"Q. Now, did you have any conversation before the sale with Koyle Hatfield about any minimum bid that he wanted on those two skidders?

"A. No, I didn't, not before the sale.

. . . .

"Q. Now you bought one then—let's back up a minute. Did you have a conversation with Mr. Poysky that morning or Mr. Wright?

"A. Not as far as I know.

"Q. How about with Harold Rouse, the auctioneer?

"A. No.

"Q. *You are quite sure?*

"A. *Yes.*

"Q. Now, do you recall specifically, if you can stretch your recollection here, coming to the place where the auction was being conducted, in the office, then stepping outside with Koyle Hatfield and Harold Rouse and John Poysky and discussing the skidders, anything at all like that?

"A. No, I don't. I can't even remember what Mr. Poysky looked like, to tell the truth, until I came here today.

"Q. Your testimony is that you don't recall any conversation?

"A. No, I don't."

Tr., pp. 123–36.

Again, it is difficult to comprehend how an appellate court, any appellate court, can with equanimity say that "Rouse's advice [to Koyle that he procure bids on his own behalf to assure a minimum price for the skidders], had it been followed, might have *avoided* the loss of David's skidder." 100 Idaho at 853, 606 P.2d at 957 (emphasis original). The jury was at liberty to believe and obviously did believe Frank Hanks and Koyle Hatfield when they testified that no such advice was given. Which is not hard to understand when Harold Rouse, on offering David's first skidder, got absolutely no bid, but declared it sold to No. 827, a non-existent bidder, for $13,500, and in that manner protected the skidder from going for less than the $26,000 reserve price. What is hard to understand, in actuality unbelievable, is an appellate court overturning a jury verdict on the premise that advice to violate the law—which had it been given would clearly have contravened the law as fraudulent, I.C. § 28–2–328(4)—put the onus on the Hatfields for a loss suffered when the auctioneer exposed for sale a skidder for which it was then known there were no bidders and sold it to one of his merchant change sale followers for less than half the reserved price! 100 Idaho at 853, 606 P.2d at 957 ("We do not of course condone Rouse's advice to Koyle that he

procure bids."). However, Koyle and Frank Hanks denied the advice was ever given.

There was never a more clear-cut case of an appellate court's rewriting and creating facts in order to overturn a jury verdict. And all done in the name of *Cox v. Stolworthy* and *Jolley v. Puregro,* and all done by the author of *Cox v. Stolworthy.* It is not surprising, then, that the co-proponent of the doctrine of those cases says in dissent that "[i]n overruling *Cox,* the majority abandons the punitive damages standards utilized consistently and *successfully* by this Court for more than ten years in favor of a system which employs no guidelines whatsoever." I have underlined "successfully." How success is to be determined lies in the eyes of the beholder. One may be certain that the trial bench and bar would be delighted to have, from today's sole dissenter, further discourse of the successful utilization of *Cox v. Stolworthy* and *Jolley v. Puregro* in the illstarred opinions of *Linscott* and *Hatfield.*

The dissent complains that the Court today "gratuitously ... throws out the rules relating to punitive damages which were established in *Cox v. Stolworthy ....*" The answer to that is simple. Those rules go as gratuitously even as they came gratuitously. Ashes to ashes; dust to dust. As I hope to have well-pointed out, "those rules" came responsive to nothing in cases where district court juries and judges had done very well in assessing the amounts.

On the contrary, and as a quote of counsel from oral argument in the dissent indicates, the continuing validity of *Cox v. Stolworthy* was discussed by counsel. In particular, I was singularly impressed that neither counsel was aware of Justice McQuade's dissent in that case, and revoiced in *Jolley v. Puregro.* If Justice McQuade was correct, and I say that he was, the *Cox v. Stolworthy* rule was an unconstitutional usurpation of authority strictly belonging to the legislature.

Moreover, such itself was forewarning that the doctrine would or should be short-lived. If the dissenting opinions in *Yacht Club* and in *Massey-Ferguson* were not fur-

ther adequate forewarning, then the scholarly law review article by Judge Kramer in the *Idaho Law Review* surely was. Forewarning usually signals a change in case law, although forewarning is, perhaps, not an absolute, as witnessed recently in *Chandler v. City of Boise,* 104 Idaho 480, 660 P.2d 1323 (1983).

## APPENDIX
## EXAMINATION OF JOHN POYSKY

"Q. What happened on the first of the four skidders there, as you recall?

"A. Mr. Hanks bought the first two.

"Q. He bought the first two. There has been testimony here that these were bought at a certain price. Are these reflected here on plaintiff's exhibit 20, lot number 27, which would be the first one was bought for $27,500?

"A. Yes.

"Q. That's your recollection of what happened?

"A. Yes.

"Q. That number up there 829, that's his number?

"A. Yes, it is.

"Q. All right. Then the second one was sold for $27,000?

"A. That's true.

"Q. Was there competitive bidding there, as you recall?

"A. Apparently there was.

"Q. All right. The third one shown down here is number 29, which is the first of David's the 1026 serial number and this was sold for $13,500?

"A. Yes.

"Q. Now, what do you recall of that sale as it happened as you heard it?

"A. Well, as near as I can recall the auctioneer put it up for sale and apparently in the course of events nobody bid on it, so he sold it to what we have we call a blind number. It's a number—we have one in every sale.

"Q. This number shown here as 827?

"A. Yes.

"Q. Was that the blind number you have?

"A. Yes.

"Q. And there were no bidders?

"A. No bidders that I can recall.

"Q. Do you know why he proceeded to sell it instead of saying there was no sale?

"A. Well, in an auction sale if you're not going to get any bids on something you just as well act like you've sold it and go on to the next piece. All you will do is create a suspicion in everybody's mind that the whole sale is fixed and kill it for the rest of it.

"Q. What happened on the next one?

"A. The auctioneer put it up for bids.

"Q. Do you recall what he put it up for bid act?

"A. I think it was $10,000.

"Q. All right. And was there another bid?

"A. Yes, there was.

"Q. What was that?

"A. $12,000.

"Q. And what happened then?

"A. He sold it to Mr. Zimmerly for $12,000.

"Q. You were present at the time and these occurred immediately after the two had been sold to Mr. Hanks?

"A. Yes.

"Q. Was Mr. Hanks present?

"A. Yes, he was.

"Q. Was David present?

"A. I can't answer that.

"Q. How about Koyle Hatfield?

"A. Yes, he was driving the pickup.

"Q. All right. What happened then. You sold the rest of the items I presume?

"A. Yes.

"Q. The sale didn't come to a stop at that point?

"A. No.

"Q. And these are items that go through number 30 and would it be fair to say that the major items of equipment, except for those skidders, came after that?

"A. Yes.

"Q. Now, the sale was completed. Do you recall the total proceeds of the sale?

"A. In the neighborhood of 200,000.

"Q. And what happened then?

"A. Immediately after the sale?

"Q. Yeah, after the sale was over and completed, in connection with these two skidders? In connection with these what happened?

"A. Koyle came up to me and said that the skidders were encumbered at the bank and if we didn't receive enough money out of them we couldn't sell them so that's when I explained to him that the third skidder and been passed because of no bid and the fourth one had been sold but that I would try to unsell it.

"Q. Did you know who it had been sold to by then?

"A. Yes, I did.

"Q. Who was that?

"A. Paul Zimmerly.

"Q. What did you do?

"A. I went to Paul Zimmerly and I asked if he wouldn't void the sale in view of the problem we had with the owing at the bank.

"Q. Before you get to that, when Koyle came to tell you what did he tell you about owing—did he say anything about owing the bank?

"A. Yes, he said that there was a mortgage on the two skidders at the bank.

"Q. Did he tell you how much?

"A. I think he mentioned the fact that there was more than they received, yes.

"Q. Was there any further discussion that ended up with a specific figure?

"A. I don't recall.

"Q. In any event it was more than what the price was?

"A. Yes.

"Q. Were you aware of that at any time before?

"A. Not on those two skidders, no.

"Q. Had you ever been told anything about any money owing?

"A. Yes, Koyle told me that he owed some money at the bank.

"Q. On the whole?

"A. Yes.

"Q. But in terms of those two skidders were you aware?

"A. I was not aware, no.

"Q. You went to Mr. Zimmerly?

"A. Yes.

"Q. And then you came back to Koyle. Did you get ahold of Koyle again?

"A. Yes, I came back to Koyle and—

"Q. Was there any further discussion about the amount of money that was owed on those two skidders—by that time that one, I guess that's all we are talking about?

"A. Yes. Yes, I think at that time he said, 'Well, that's fine because,' apparently he had talked to David in the meantime and said that there was in excess of $20,000 owing.

"Q. Any specific figure that you recall?

"A. No.

"Q. There is some testimony here about $26,000?

"A. I don't recall that that particular figure was mentioned.

"Q. All right. No, you knew nothing about that at that time?

"A. No.

"Q. Okay. If you had known there was more than $20,000 owed, would they have gone to the auction?

"A. Well, if I had known at that point they would have had to go through the auction but something would have probably had to have been done.

"Q. But now, prior to that time?

"A. No.

"Q. Would you include it?

"A. No.

"Q. Why not?

"A. Well, in my own opinion I wasn't sure they were worth that much money.

"Q. Now, you came back and told Koyle Hatfield what?

"A. That I had talked to Mr. Zimmerly and Mr. Zimmerly had agreed to void the sale and I thought I had the problem solved.

"Q. And what happened then?

"A. I left with another customer that wanted to talk to me about having an auction sale and apparently Mr. Zimmerly went and talked to his partner and they decided they weren't going to give up the skidder so they went in and paid for it.

"Q. But you had no further discussion with Mr. Zimmerly after that?

"A. No.

"Q. There has been some mention here about—I guess Mr. Zimmerly mentioned about some prior work. Had your company ever handled a sale for Mr. Zimmerly?

"A. Yes, we did.

"Q. And has Mr. Zimmerly appeared and bid on other items other affairs that you've had?

"A. Other sales, yes.

"Q. And you left with another buyer and you had no further contact with any of these people?

"A. No."

CROSS–EXAMINATION OF
JOHN POYSKY

"Q. Mr. Poysky, you realize you and I discussed a lot of this over in Seattle ten days ago and that was in your deposition we read yesterday?

"A. Yes.

"Q. You don't mind if I ask you a few more questions because of some things Mr. Reed brought up, do you?

"A. Fine.

"Q. One thing. You knew that this Mr. Zimmerly was a dealer, what we would call a dealer?

"A. When I first met Paul he was a contractor and we had a sale for him.

"Q. I know that. Let me say this. My question wasn't very good and I'm sorry. At the time of the sale, after Mr. Wright said he could have it and you had left, but I'm just saying that day on February 22nd, you for one at least knew that he was a dealer in this kind of equipment?

"A. To be very honest with you sir, I did not. I thought he was buying that machine for his own use.

"Q. You didn't know what he was doing then really?

"A. No.

"Q. If he is a dealer on the books and records of your company, you don't have to obtain a sales tax from him do you?

"A. That's right.

"Q. Are you acquainted with the fact that he was not charged any sales tax because he was a dealer, did you know that?

"A. Yes, I saw that bill.

"Q. You saw that here today?

"A. Yes.

. . . .

"Q. All right, thank you. Now, we got to the second skidder, the one Mr. Zimmerly got. Mr. Reed put a question to you. He asked you in this language, I wrote it down here, you got another bid and you say—I mean Harold got another bid, Harold Rouse, got another bid, and you said, 'Yes, he got a $12,000 bid from Mr. Zimmerly,' as though that were another bid. Now, was that just an inopportune choice of words or was there a prior bid?

"A. I can't really answer that because in my position on the floor I don't always see what is going on, I'm looking for people to bid.

"Q. I appreciate that. I mean that's why I'm asking the question so you can clarify it, because maybe it went fast. The question was in terms of another bid. You really can't say there was a prior bid?

"A. No.

"Q. When Mr. Rouse would come to the second skidder, the one Mr. Zimmerly got—I realize you're not an auctioneer are you?

"A. No.

"Q. But you've been around quite a few auctions now?

"A. Yes.

"Q. You understand what the auctioneer does, he asks for bids?

"A. Yes.

"Q. And would this be the way he would do it and did he do it that way this day, 'We're now here to this Clark skidder such and such and I'm asking for a bid and $10,000?

"A. That's probably what he did.

"Q. And could it be that Mr. Zimmerly being maybe a good operator just said, 'I'll bid 12,' because the other one hadn't been sold, had it? So could it be, do you think, that Mr. Zimmerly made the only bid and said, 'I'll bid 12.'?

"A. That's possible.

"Q. Now, when you and I discussed this ten days ago in Seattle we didn't have some of this evidence there with us did we, like the terms of the sale?

"A. No.

"Q. And you had been thinking that day that this was, was a sale without reserve, had you not?

"A. Yes.

"Q. And since then you seem to think that items 10 and 12 of the terms of sale show that it was with reserve, you see that don't you? Maybe you haven't looked at it, I don't know. Do you want to look at it?

"A. Yes, please.

"Q. I don't want to be unfair. You've always been nice to me. You've got it right here.

"A. Oh, here it is. Okay, 10 and 12 you wanted?

"Q. Yes, look at those and see if there isn't something on 12, I think, saying that

the auctioneer can withdraw any item, doesn't have to accept a bid.

"A. It says so right there.

"Q. Isn't that in essence, Mr. Poysky, what Mr. Rouse must have done on David's first skidder was withdraw the item. In essence he did that, it was withdrawn?

"A. Well, he received no bids so I guess if that's withdrawing it I guess that's withdrawing it.

. . . .

"Q. Now, as this sale moved along and they came to David's first skidder and you think that there was no bidder, the way that it was handled rather than withdraw it, the way you have explained it to Mr. Reed, Mr. Rouse as auctioneer went through the motions and put on the act as though he had a bid and said, 'Sold for 13,5.'?

"A. That's true.

"Q. Isn't that what really happened?

"A. Well, I believe that's right.

"Q. I mean you didn't know at the time did you, that is being there on the floor as you call it, I mean you can't see everything. He could really have had a bid as far as you know?

"A. It's possible.

"Q. Well I mean very likely couldn't he?

"A. Yes.

"Q. The auctioneer doesn't say who he sold it to does he?

"A. He just gives the number.

"Q. That's what I wondered. On every kind of item, say when Hanks bought those two did the auctioneer did the auctioneer call out, 'Sold to bidder number 829.'?

"A. Yes, he does.

"Q. Sold to bidder 829. Okay. When it came up on David's first skidder you knew then, you actually knew that he didn't have a bonafide bidder. You knew that right there on the spot?

"A. I believe that's right.

"Q. Because you would have to, wouldn't you?

"A. Well, yeah, you would use 827.

"Q. You've been around here for four years, you know when 827 comes up, it's no sale?

"A. No that's not the standard number, 827 isn't the number on every sale.

"Q. You kind of shift it around?

"A. Well, sometimes they start the auction, he has one, I think over there, we started this particular sale with number 801, it was the number here and we started registering them from there, so we used 827. The next time we may use 201 as the starting number and maybe 292 will be the number.

"Q. You have just had the terms of the sale in your hand. There is no place on there that you tell any of your buying public that you do have this blank bidder, do you? And that's not on your auction agreement with Mr. Hatfield, is it?

"A. No.

"Q. And you and Mr. Hatfield never discussed the blank bidder ever in your life, did you?

"A. No.

"Q. There was really nothing then to stop Mr. Rouse from knocking off David's second skidder to number 827, was there? He could have pulled a bid out of the air and sold it?

"A. I guess he could have, yes.

"Q. All right. But he didn't?

"A. No."

Tr., pp. 273–90.

## EXAMINATION OF JOHN POYSKY

### as Defendant's witness

Q. All right. Who else was present at the time of the conversation?

A. Harold Rouse, Koyle Hatfield, Frank Hanks and myself.

Q. Let me back up a minute. Why was Harold Rouse there, what function did he serve?

A. He was the auctioneer.

Q. He is the auctioneer at all your auctions?

A. Yes.

Q. Now what was said as best you recall at that time?

A. Well Koyle said that—well, I introduced him to Harold first and the conversation came around to the fact that Koyle was worried about the four skidders with the market the way it was and all and he said that his son-in-law was desirous to buy one?

Q. To buy one?

A. That's the conversation, yes, buy one. And, I said, "Well, that's fine, you're more than welcome to bid we are always looking for bidders." And, then he wanted to know what might happen with the rest of them and so I said, "Mr. Hatfield, as long as your son-in-law is here and he is going to be bidding on one of the four skidders and if you wanted to have some protection on them, he's the man to do it."

Q. Did Koyle Hatfield, at that time, tell you anything about prices? Did he say anything about dollar amounts?

A. I don't recall.

Q. Now, you and Mr. Rouse was present there at that time?

A. Yes.

Q. Did Koyle Hatfield have any bidding number?

A. Not that I know of.

Q. And did David?

A. Not that I know of either.

Q. All right. Was there any other contact—this didn't take place, I presume, in 30 seconds, it was a little longer than that?

A. Probably five or ten minute discussion on it.

Q. And was there anything else said that you can recall concerning—you said that Koyle was concerned about the price, market?

A. Yes.

Q. And was there anything else said concerning how this should be done or what should be done or anything like that?

Q. Only that, as I explained, I thought that his son-in-law, if they were desiring to get a certain amount of money out of the skidders, that he should do the bidding for them. It wouldn't look very good to have David or himself do it.

Q. Now, was there any mention of the term minimum bid?

A. I don't recall.

Q. Now you are saying you don't recall, you don't recall whether there was or was there any mention at all of it?

A. I don't recall that there was, no.

Q. All right. Now, was there any further discussion at that time?

A. No.

Q. And again no—were any written instructions provided?

A. No.

Q. What was your function at this auction?

A. Well, at this particular sale I what we call worked the floor.

Q. What does that mean?

A. Well, the auctioneer is up on the auction block, which happens to be a pickup in this instance, I'm down on the floor and we've got a bid crowd around you and quite often the auctioneer might not see somebody that wants to bid or is trying to bid and we have floor men that help him, and this was my particular function that day.

Q. Did you bid at that auction?

A. No.

Q. Do you ever?

A. No.

Q. Was there anyone else as a floor man there?

A. I don't guess there was.

Q. Now, the skidders that belonged to Koyle were put up for sale I presume? His two skidders were auctioned off in the normal course of events?

A. Yes.

Q. Incidentally, did you follow the order here as listed?

A. Yes, we did.

Q. I notice the initial items are rather small, is there some reason why those would be set up first?

A. Yes, we normally start a sale with a number of small items. Maybe somebody is going to be late to the sale and this gives them a chance to arrive on time and we spend maybe 30 to 45 minutes selling small items.

Q. The skidders that belonged to Koyle Hatfield are lots numbered 27 and 28, is that correct?

A. Yes.

Q. All right. Then the next two, which are the ones that belonged to David, are lots numbered 29 and 30?

DEPOSITION TESTIMONY OF
JOHN POYSKY

which was read to the jury as
original evidence

"Q. Mr. Poysky, would you state your full name, your address, your occupation or profession?

"A. My name is John Garland Poysky, and I live at 2417 West Crockett, Seattle, Washington, and I'm affiliated with an auctioneering company as appraiser and auction, I guess you would call it a man that appraises and signs up auctions. Kind of a hard description to make, but that's generally what it is.

"Q. Could you give me a little summary of the structure of this Rouse Auction Company? That might be the shortest way?

"A. Well, been in business, I guess, since about 1920, strictly auctioneering business, industrial plants, and construction equipment, and logging equipment, and anything that can be auctioned. We don't mess around with furniture and Persian rugs, and things like that. Generally the industrial heavy end of it. Harold's father, Max, started the company. He's dead now. The day of sale, if you want to get that, is that

what you mean, generally what happens the day of the sale?

"Q. Well, before we get down to that, you mentioned Harold Rouse being there. He's the son of Max Rouse?

"A. And he owns the company.

"Q. Who are some of the other sons?

"A. There are none.

"Q. Harold, he's the main stockholder?

"A. Harold had a cousin that was considered a son, who is dead now, so Harold owns the thing lock, stock, and barrel.

"Q. And it's probably something you may or may not know, but as I gather it from Mr. Reed in some letter he wrote, it has more than one corporate entity?

"A. Right.

"Q. Max Rouse Northwest and—

"A. And I guess they've got a couple down in Los Angeles, too, also.

"Q. Behind it all is Harold Rouse?

"A. Yes.

"Q. Some of the information which filtered down to me on the corporation came from a Roland or Ronald LaBeau.

"A. Ron LaBeau, yes.

"Q. You know him?

"A. Yes, I do.

"Q. Is he a corporate officer, like corporate attorney, corporate counsel?

"A. Well, I can't answer that for you. He's attorney for the corporation, yes, but now—rephrase the question.

"Q. Who are some of the other officers in Max Rouse & Sons besides Harold?

"A. Well, let's see, the Northwest, which, of course, I'm involved with, is Carl Wright and myself.

"Q. How do you spell Wright, W–R—

"A. W–R–I–G–H–T. What the structure is of the corporations I have no idea.

"Q. What's Carl's status here with Northwest?

"A. He's Vice President.

"Q. What's yours?

"A. I think I'm Secretary-Treasurer.

"Q. Are you a Director besides being a Secretary-Treasurer?

"A. Yes.

"Q. Are there just the three Directors?

"A. Yes.

"Q. I didn't ever ask who is President. Who is President?

"A. I presume it must be Harold."

EXAMINATION OF HAROLD ROUSE

Q. Would you state your name, sir?

A. Harold Rouse.

Q. Where do you live?

A. Los Angeles, California.

Q. And what's your occupation?

A. Auctioneer.

Q. And what company are you with?

A. Max Rouse and Sons.

Q. Now, who was Max Rouse?

A. He was my father.

Q. How long have Max Rouse and Sons been in business?

A. Since about 1920.

Q. And when did your father pass away?

A. He passed away about—he had been retired for almost 15 years before, he passed away about four years ago.

Q. He had been retired. Who else in this company business with you?

A. My brother-in-law also at that time. He also passed away.

Q. And Max Rouse and Sons Northwest, this is a separate company?

A. Yes.

Q. And you have an interest in that company?

A. Yes, I do.

Q. And how long have you actually been in the auction business?

A. 28 or nine years.

Q. And where have you conducted auctions?

A. Well, in most parts of the United States and Canada.

Q. And what kind of business do you do?

A. What type of equipment you mean?

Q. Yes, uh-huh.

A. Large equipment, earth moving and logging and then down to machine shops and things of that nature.

Q. These are major items of equipment?

A. Pardon?

Q. Major items of equipment?

A. Yes.

Q. And in recent years, say the last five, how many auctions a year has your company been involved in?

A. I would say from 50 to 55 or so a year.

Q. Now what precise function do you serve in this company?

A. I'm the auctioneer.

Q. You personally call the auctions?

A. Yes.

. . . .

Q. All right. Now, was this the conversation we have talked about before?

A. Yes.

Q. All right. Can you tell me, was this about 15 minutes before the auction?

A. Yes.

Q. And who was present in that conversation?

A. Mr. Poysky, Koyle Hatfield and I believe his son-in-law.

Q. That's Frank Hanks?

A. Frank, yes.

Q. Were you introduced to him at that time?

A. Yes, I was.

Q. Was he identified as the son-in-law?

A. Yes.

Q. He had a bidding number?

A. Yes.

Q. All right. Now, what was the conversation as you recall it?

A. Well, I believe the conversation was mainly we talked about all the equipment, I believe, but mainly about the skidders that indicated before that Mr. Hatfield was nervous about them.

Q. Now, before you get to that, in talking about the equipment were there discussions about the value of these items?

A. Normally when we go through and look at the equipment there is a discussion as to what people think the things are worth at an auction sale, that was part of the conversation.

Q. This was the conversation you had—did this apply to all the equipment?

A. Yes, we talked about more than just the skidders at that particular time.

Q. And would this have been the conversation about prices on all of the equipment?

A. Well we just discussed what we thought it was worth and what it might bring.

Q. Does this happen in other auctions?

A. Most every auction I go to we go through and discuss what it might bring, we discuss it sometimes with ourselves and the owner.

Q. And that happened in this instance with Koyle?

A. Yes.

Q. And you believe his son-in-law was along?

A. Yes, I'm positive he was long.

Q. All right. Now, can you tell us what was said in that conversation with particular reference to the skidders?

A. Well, there was an indication, I guess, as to what Mr. Hatfield thought they were worth and he was, you know, worried about the price of what they might bring because I guess the logging business at that time was down and in the conversation he wanted to know what would be done to more or less to see if they didn't bring enough money. Well, my function as an auctioneer, and we've been in business a long time, is to sell the equipment to the

highest bidder and I indicated that to him and I guess as he got more nervous John told him, it had been mentioned that his son-in-law was going to bid on a skidder and that if he wanted to protect himself that a good man to do this protecting would be his son-in-law. *When we left that little particular group of conversation I was under the impression that if there was any protecting to be done that the son-in-law would do it.*

Q. Now, did the son-in-law or the son-in-law of Koyle Hatfield indicate to you that he wanted to buy one of the skidders?

A. I heard mentioned that there was one skidder that the son-in-law did want to buy, yes.

Q. Now, did Koyle Hatfield say anything to you about minimum bid?

A. *There was never a mention of a minimum bid.*

Q. *Are you absolutely sure?*

A. *I'm positive of that.*

. . . .

Q. When you got to the third one, what happened there?

A. When this had gone for around 27 I figured that one would go, you know, somewheres near, maybe in the 20,000 range or so, because it was a little older. So, I said "13, 5" and at that point I tried to get more money and nobody came in so I sold it to a number that we had designated before just for that occasion. Sometimes when you go to an auction sale you make a mistake and you open things too high and it belongs to you. I was just stuck, I couldn't back down. If I backed down I would lose face and lose the crowd and all the rest of the equipment that I would have to sell possibly would have brought a lot less money because people would think there was something going wrong. So I could not afford to lose face with the crowd. So when I opened at that particular point, which I had made a mistake, which I had done before it wouldn't be the first time, but the indication was that the other ones went for that kind of money I thought they would go, you know, in some range above $20,000.

Q. So, you declared it sold to number—

A. Yes, which we had designated before as the number we would use at any sales where this could happen.

Q. That is 827?

A. Right. Okay, in this instance it was.

Q. That was the number at that time, is that right?

A. Yes.

Q. Okay. When the second one came up, now these are all consecutive?

A. All right. What happened, and I remember this instance clearly because at this particular time you had to think what's going on very fast. When we were selling that first one, I mean the third one which I opened up at 13, 5 and nobody came in and then Mr. Hanks didn't come in I thought I had made a big mistake because of the fact that I went bigger than he would have bid on it if they wanted to keep it. So now here I hadn't sold this one, I really hadn't sold it and worse maybe, because now I figured the Hatfields would be mad at me because I hadn't sold it and they wanted to sell it because Mr. Hanks didn't bid on it. So, when the next one came up instead of starting it at 13, 5, I started it at $10,000 because I realized I had made a mistake and I asked for more bids and finally, what's his name, Zimmerly, came in at 12,000 and then I asked for more and then Mr. Hanks didn't bid so in my mind I thought I had better sell it, because what could I do. At that point I had a legitimate bid, on the other one I didn't, so I sold it.

Q. Now you knew that when Mr. Zimmerly bid that he was a legitimate bidder?

A. Yes, well if anyone else had bid, it just happened to be that it was Mr. Zimmerly.

Q. And this would be anybody?

A. Yes.

Q. It didn't matter. Then no bid came from Mr. Hanks?

A. No.

Q. Or anybody else?

A. No.

. . . .

## CROSS–EXAMINATION OF HAROLD ROUSE

Q. Now on this one proposition on the—I don't know if we ever got an answer to this question—on this second skidder that Mr. Zimmerly got, we know you didn't cry the virtues, did you ask for a bid?

A. Normally I don't ask for a bid. I say, "$10,000," or whatever I think the opening bid should be.

Q. You can't bid yourself can you?

A. No, but I start it off.

Q. You said by asking for a bid of $10,-000?

A. Yes.

Q. These people—

A. I don't ask I say $10,000 and then if the people—you have to realize that you're dealing with psychology. If I think the thing is worth 17 or 18 and I opened it for 10 there's a lot a room to go up, but we can make mistakes at times. So when I sold the first one, the next one I opened it for 10. That is the function of an auctioneer. I have to make that decision at the time. If I had said 2,000 at that time maybe Mr. Zimmerly would only bid another $500, I don't know. But it's the auctioneer's function to get as much, that's what we are hired for. Why did Mr. Hatfield call us and hire us in the first place, because he must have thought we knew what we were doing and could do a good job. So therefore, I said, "$10,000," and the next bid was 12, I assume, here and I tried to get more and nobody come in. Do you think that it does me good to get less money. I get paid a commission on whatever it brings, whoever buys it. I am trying to get as much money as I can for an item.

Q. You said one thing, Mr. Rouse, there while you were explaining that. You touched upon the situation where you might have started the bidding at $2,000, and you say Mr. Zimmerly only went up 500, you know, 2500, he called out from the floor,

"I'll give 2,500." A person can sound out his own bid can't he?

A. I didn't hear what you said?

Q. A person, a buyer can sound out his own bid to you?

A. He's supposed to.

Q. You call for a bid and he holds up his hand?

A. Yes.

Q. Okay. But he can also say—say you say, "I've got this nice skidder here and I'm just open for bids, who will start it anywhere." Anybody can, I can get up and say I'll go to 5,000, can't I?

A. Yes.

Q. That's a bid isn't it?

A. Yes.

Q. And supposing—

A. That's why we try to start it at a reasonable amount so just that thing won't happen, what you're saying. We try to avoid that.

Q. All right. Now supposing he did start at 2,000 like you said and then Mr. Zimmerly called out a $500 increase and here you have a bid of 2,500 and you were talking about that and you said, "That would be a bad situation." That would be bad wouldn't it?

A. Yes.

Q. If you don't get any more bids, as I take it, you are going to strike it off to him?

A. I'm going to say, "sold."

Q. What do your terms of sale say about your right to withdraw?

A. My terms of sale are for the customers that comes to an auction, not in the agreement. The terms of sale if you come up to the—

Q. I didn't ask you that, I'm going to interrupt now—

A. The terms of the sale do not apply to me as an auctioneer, they are for the customers to sign. I never sign this.

Q. You don't think you are bound by the terms of sale?

A. The customer is.

Q. You don't think your seller is bound by the terms of the sale?

A. You mean me?

Q. You just work for him. You're not the seller, you are the auctioneer, aren't you?

A. Yes.

Q. Who are you working for?

A. You're right we are working for the people that hire us.

Q. And that's the seller?

A. Yes.

Q. Kind of hard to remember that sometimes, isn't it? You're working for the seller, right?

A. Yes.

Q. Now before we disgressed there I was trying to ask you and I think you answered, maybe. If you had a 2,500 bid that you would strike it off. Now, I'm asking you this, this is where you left me, I was asking you to look at your terms of sale there. *This was an auction advertised with reserve. You have the right not to accept any bid if you wanted, didn't you?*

A. *It wasn't advertised without reserve.* This was the date of the auction, sir. We have another brochure we send out to advertise. This is not advertising material. This we give the customer at the auction at the auction sale.

Q. It's the terms of sale, isn't it?

A. Yes.

Q. Hold it up to the jury so they'll know what we are talking about. That slick folder there is the terms of sale?

A. This is the one you get.

Q. That's what governs the sale, isn't it?

A. Yes.

Q. Okay, but you do put out advertising to catch people's fancy?

A. We put out advertising to get customers to the sale. And this isn't one of the things that we mail to the public.

Q. No.

A. Okay, now we understand—I understand what you are saying.

Q. And you did put out or cause to be put out advertising for the sale?

A. Yes.

Q. *Now, in all these years you know what it is to pick up a newspaper and see a big ad that says auction sale that says no limit, no reserve, you know that?*

A. *Yes.*

Q. All right. *It means without reserve, doesn't it?*

A. *Yes.*

Q. And that means, so you can tell the jury here, that means that you, when you once start calling out bids and get a bid, you would have to see it out wouldn't you? You would have to sell it?

A. Well, I know what you're getting at—

Q. Just answer my question, don't try to guess what I'm getting at?

A. Yes, yes.

Q. A lot of people have failed at that—

A. Yes.

Q. All right. It's without reserve and it gets on the block and you have a bid and you have to go ahead and sell it?

A. Yes.

Q. And if it's without reserve you can, until you get a bid and until you the auctioneer acting for the seller, *until you accept that bid you can withdraw the item can't you?*

A. *Yes.*

Q. All right. And, if you've got a man at your sale that's got a machine that is obviously worth $20,000 or $18,000 or even $12,000 and you get a $2,500 bid and your duty and your obligation to the guy that hired you, you are going to withdraw that aren't you. Maybe you're not but that's what you should do, isn't it?

A. No, because when the man once makes the bid and he says a certain price then I've accepted his bid. I have to sell it to him. He is the high bidder.

Q. *Are you telling us that the law is that if a man makes a bid he's got it?*

A. *If I accept the bid he's got it.*

Q. *That's if you accept the bid?*

A. *Yes.*

Q. But you're standing up there, you're the head guy and you're in charge and you're on the back of the truck and you get a ridiculously low, ruinous, sacrificial bid and you're working for this guy that's driving the truck and he hired you, you don't have to accept that bid, do you?

A. You know I'm going to have to disagree with you about ruinous, sacrificial bid, because when you publish an auction—

Q. I'd like you—

A. You've got the bidders here at the auction. You've advertised. That is the bid. That's what that piece of equipment is worth at that particular date. So why do you tell me that something was ruinous and sacrificial. That's what it's worth.

Q. Now just use my question. My question is, under items 10 and 12 of the terms of sale—

A. Let me look at 10 and 12 here. I have to look at them, what do you want me to—

Q. We're going to have a little educational course here. Read 10 and 12. Read them outloud?

A. Ten is, "The auctioneers have the right to consolidate or break down lots or to offer a complete facility as a single lot. Auctioneer reserves the right not to acknowledge or accept any bid which is merely a fractional advance over the preceding bid. The auctioneer retains the right, without notice, to withdraw any lot or lots prior to the sale of said lot or lots."

Q. All right. It isn't sold until you accept the bid is it?

A. Well, here is—

Q. Answer that question.

A. What did you say?

Q. An item isn't sold until you, the auctioneer, accept an offered bid?

A. Well, it's a matter of semantics—

Q. Just answer me—

A. May I say this—

Q. No, I wan't you to do this?

A. What?

Q. I don't want to get in a shouting match with you.

A. What?

Q. Just answer my question.

A. I don't realize what—

Q. You've got a real good lawyer here—

A. All right. Go ahead.

Q. And he will get a chance to help you—

A. Now, I'm trying to answer your question. You're making it difficult for me.

Q. Well, I'm trying to just do my job.

A. Okay. Well, I'd like to answer it.

Q. My question was, you're the auctioneer and you get an offer and some guy holds up his finger or whatever he does to say he will offer a bid at a stated level—

A. Yes.

Q. All right. You don't have a sale, do you, until you, the auctioneer, says that bid is accepted?

A. I say, "sold," I don't say, "accepted," I say, "sold."

Q. All right. And that's how you accept it by saying, "sold."

A. Yes. Well, no, wait a minute, if there's another bid after that, it goes on. When I say, "sold," that means that it's sold, right. But may I ask—say something further?

Q. No. Not unless I ask you a question?

A. All right. Go ahead.

Q. Don't forget that you've got Mr. Reed here and he's on your side.

A. Okay.

Q. Just as to your interest in the outcome of this lawsuit you told Mr. Reed that you have an interest in Max Rouse and Sons Northwest?

A. Yes.

Q. And that interest is very close to 100% is it not?

A. No, it's 49%.

Q. You only have 49. Mr. Wright has the other big portion?

A. He has 26 and I think John Poysky has 25.

Q. So they've all got substantial interest then?

A. Yes.

Q. All right. And you've got interest in some other Max Rouse Corporations?

A. Yes.

Q. I have just one other note here that I will give you a chance to say something about. As I understood it, and I'm just telling you what I think I heard here today, you told Mr. Reed on your direct examination that in your conversation with Koyle Hatfield where you looked at some of the equipment that you say that he gave you his idea of what these items were worth?

A. Yes.

Q. And I assume you gave him your idea, as an auctioneer, as to what they would bring?

A. My function as an auctioneer—what John or Carl does, they give me the idea as to what it's worth. I don't really—I have an idea but they are the experts as far as what the equipment is worth.

Q. Well, now, you said something here too on your direct examination that you get the owner's idea?

A. Yes.

Q. And before you start the auction you have your own idea?

A. Well, I get that from John or Carl, whoever had signed up the deal.

Q. So, the corporation is really the auction firm here, right?

A. Yes.

Q. And the corporation gets a composite idea from the other corporate people, John Poysky and Carl Wright, as to what the property should be worth?

A. Well, the auctioneer gets the idea from them.

Q. That's what I mean.

A. Yes.

Q. Then you go ahead and act for the corporation and you do the actual crying of the sale?

A. I cry the sale.

Q. And you told Mr. Reed that you sometimes disagree with the owner, you have your own idea?

A. Yes.

Q. *And your recollection is that you were there when John Poysky made a suggestion to both Frank Hanks and Koyle Hatfield that Franks should shill or puff the sale if the bidding didn't get up where they wanted it?*

A. At this particular time, when this discussion was going on, I really, I may have said John but I don't know who really said it, but I've been hearing this, you know, as a witness, but I know the suggestion was made. *Now, whether it was Koyle or John, I don't know. I assume that it was John because John mentioned that he did suggest it.* We do not like owners to buy stuff back at an auction because it hurts the auction if they do and as far as we are concerned we don't want any limit or reserve on any auction, although you may have brought it out in this thing that it does say it, but we feel that every auction that we have is without limit or reserve because this is the way we conduct our business and this is the way we have developed a reputation. People come and buy from us.

So, at this particular time I was a little—when John said this to—or John or Koyle or whoever it was suggested this I wasn't in favor of it. But, being he was so nervous at this particular time I just let it go. I figured he was going to protect it if it didn't go for enough money.

Q. You weren't in favor of what, Mr. Rouse?

A. Of trying to have Mr. Hanks bid on the equipment. But I said I would go along

with it at that time because I figured I didn't want to argue with them about it because he was pretty nervous at that particular time.

Q. But you generally disapprove of having somebody bid if they are not legitimate bidders?

A. Yes I would.

Q. In this particular case you thought it would be okay?

A. Well, I didn't think it would be okay but I went along with it.

Q. *You were the head man, you could have stopped it?*

A. *I could have, yes.*

Q. You heard Mr. Poysky tell both Hatfields, no just one Hatfield and Mr. Hanks, one Hatfield, Koyle and Mr. Hanks that it would be better if David and Koyle didn't bid. You hear Mr. Poysky say that?

A. I heard him say it on the stand, yes.

Q. You don't remember that he said it that day?

A. I don't remember, but—

Q. But you feel the same way?

A. The problem is that you—well, yes.

Q. *It isn't fair competitive bidding for your buying public if your owners have got one or a half a dozen people out there shilling the bid.* That isn't nice, is it?

A. No.

Q. That isn't nice is it?

A. No.

Q. *It's kind of dishonest isn't it. In a way it's kind of dishonest to the public?*

A. *This is why I object to it in the beginning.*

. . . .

Q. So we can leave it with this. This shilling is a practice you don't like?

A. I do not like it, no.

Q. But it happened that day, no I mean it didn't happen, but you suggested it, you didn't do it, no sir, but you heard Mr. Poysky suggest that it be done?

A. I don't know that I heard Mr. Poysky, *I guess it was suggested. I really can't recall who suggested it. I just heard this in court.* It's a long time to remember all those details.

Q. And then you said one other thing I've got blocked out here. You have had sort of a practice on your own as an auctioneer and in your firm that you start out with what you figure half the value?

A. Not necessarily half. I make a decision at that time. It may be half it may not be, I don't know, but I take a value that is considerably less than what I think the item is worth.

Q. And I've wondered about one other thing. You have talked about, and we'll go back to the air bid situation on David's first skidder, we are talking about that one now. You called that one as open for bids—maybe you didn't use the words open for bid, but you said, "13,500", would that be right?

A. Yes, I would assume so now, yes.

Q. How did you do that?

A. I just say, "13,500, 13—"

Q. How do people know what's for sale?

A. Okay. I say lot number 48 or whatever the lot number is and then I say it's a skidder, whatever model it is, and then I say the bidding is—then I say, "who is open for bids," and if nobody really says anything then I say, "13,500," like that and that's all I do. I mean I do say certain things, I don't know exactly what I say at the time, but I say what the item is and the lot number.

Q. I knew you said that but you've got to close this sale on this item sometime, you've got a 13, 5, you had to say, "going once?"

A. Well, yes, and I sold it to the number that we had suggested before.

Q. You had to say, "13, 5, going twice," and you are letting the people think that you had a bid at 13, 5, weren't you?

A. This is true.

Q. And then you said, "Sold to number 827 for $13,500?"

A. That's true.

. . . .

Q. Mr. Rouse, I thank you for your time. I just have one question to make sure that I understand you right. We are in agreement that your obligation is to the man that hires you and that's the seller?

A. Uh-huh.

Q. At the same time I gather that you are a man that feels that you do have, also, an obligation to the public, the buying public?

A. You have an obligation to everybody, really. But your obligation is to get the most money for it in the end, that's what you're hired for, and if you want to put the obligation, the first obligation is to the owner, your second is to the public.

Q. Somewhere in there there is an obligation to the auctioneer?

A. I don't think there is any obligation to the auctioneer. If he doesn't do a good job you shouldn't hire him. That's what he is there to do.

Q. In the final analysis whether an item should sell or shouldn't sell at an auction with reserve, as Mr. Poysky said and I think you said, you think that decision lies with—

A. *I never really have an auction with reserve so I don't know.*

. . . .

Q. Now, Mr. Rouse, I often get confused and I thought that you looked at that a few minutes ago and read it and said that this auction the terms are with reserve?

A. I think you said that. I said we have never conducted an auction with reserve.

Q. I don't care how you conduct it I'm talking about the printed terms that you handed out there?

A. *The printed terms doesn't say with reserve.*

Q. You don't think 10 and 12 say that?

A. No, I don't think it does say with reserve. It says you have a right. It's a different thing to advertise with reserve to the public when they sign to have a right to reserve it. It's a difference.

Q. Doesn't it say right on there, *isn't the word reserve right in 10 and 12?*

A. *Yes, the word reserve is in there* but I think you are misconstruing it.

Q. Well, I might be, but I don't think so. Let's say this, the auctioneer is only working for the seller, the owner, isn't he?

A. Yes.

Q. He doesn't have any rights in the world other than his contract gives him, right?

A. If that's the law, yes.

Q. Okay. And the contract creates the employment, it creates the relationship. And when the auctioneer reserves, this item 10 and 12 thing on there, when he reserves, he's reserving for the seller the right in the auctioneer as the seller's agent to withdraw, isn't he?

A. I do not know. I do not know the law. You'll have to tell me. You say that, I don't know.

Q. You don't know the auction law then?

A. I really don't know how to answer that.

Q. All right. I'm not going to argue that with you.

A. I can't argue the law with you, I just really don't know.

Q. You don't know the auction law?

A. I do not know how to argue your point of the law that you are telling me at the moment, I really don't. If I knew the answer I would tell you.

Q. You have access to an attorney in Beverly Hills do you not?

A. No, my attorney isn't from Beverly Hills.

Q. Or Los Angeles?

A. Yes.

Q. Mr. Labowe?

A. Yes.

Q. You've never found out from him just what we are talking about?

A. I think he made up the terms and conditions here.

Q. Pardon?

A. He might have made up the terms and conditions.

Q. And he might have made up the auction agreement itself, too, mightn't he?

A. No, a different attorney made that up many years ago.

Q. So Mr. Labowe made up the terms and conditions?

A. I don't really. I said he might of, I don't know. I think they are a composite probably of many auction terms and conditions that have evolved over the years and then we had him check it and go through with it.

Q. So we can leave it on a happy note between each other whether it is or isn't with reserve you are not going to say, you think that is a question of law, but as far as you and the auctioneer are concerned when you're down there at Hayden Lake holding this auction it's without reserve?

A. Yes.

Q. That's the way you're answering?

A. Yes.

. . . .

### REDIRECT EXAMINATION OF HAROLD ROUSE

A. When we send out just what he was saying, you know, why this is done. Over the years when my father used to be, when he was active in the auction business, people would put out an auction brochure that would say without limit or reserve. Well he came to us one time and said, "This isn't right, auctions are supposed to be without limit or reserve, why put something in people's minds that doesn't exist." So therefore, that's kind of a negative connotation when you see it on a brochure. In all our auctions we conduct, they are supposed to be, I don't know now what I'm doing, if we do or we don't, after listening to the attorney, you know, I don't know. But, the thing is that we never put on any of our brochures without limit or reserve. We

just assume that that's the way an auction should be. And here he says that we should have it on. Well, I never knew that by the law we should have it on to conduct an auction sale. I just assumed that that's what an auction was. And, my father felt that way too because if you put it on there you now put in the public's mind that there are such a thing as a limit and reserve auction. This is why we don't put it on. We haven't for years. I don't know how many brochures over the years that we have had but there are none of them.

BAKES, Justice, dissenting:

I dissent from that portion of the majority opinion which affirms the award of punitive damages against the defendant Palos Verdes, but nevertheless gratuitously, and by *obiter dictum,* throws out the rules relating to punitive damages which were established in *Cox v. Stolworthy,* 94 Idaho 683, 496 P.2d 682 (1972), and which have been consistently followed by this Court until today. *See, e.g., Yacht Club Sales & Service, Inc. v. First Natl. Bank of North Idaho,* 101 Idaho 852, 623 P.2d 464 (1980); *Linscott v. Rainier Natl. Life Ins. Co.,* 100 Idaho 854, 606 P.2d 958 (1980); *Hatfield v. Max Rouse & Sons Northwest,* 100 Idaho 840, 606 P.2d 944 (1980); *Thompson v. Dalton,* 95 Idaho 785, 520 P.2d 240 (1974); *Jolley v. Puregro Co.,* 94 Idaho 702, 496 P.2d 939 (1972). I say gratuitously because the rule announced by the Court today with regard to overruling *Cox v. Stolworthy, supra,* was not raised by either party in their issues on appeal. This Court has repeatedly stated that it will not consider issues not assigned as error. *See Cox v. Mountain Vistas, Inc.,* 102 Idaho 714, 639 P.2d 12 (1981); *State ex rel. Haworth v. Berntsen,* 68 Idaho 539, 200 P.2d 1007 (1948).

When the majority states that "*Cox* has been demonstrated to be at best unworkable and at worst impossible," *ante* at 668, the appellant in this case will surely ask in a petition for rehearing, "Where has it been demonstrated in this case?" It was not shown before the trial court because the issue was never raised there. It has not

been demonstrated on appeal because the parties did not assign that as error. In fact, just to the contrary, appellant's counsel stated at oral argument:

"I think that this Court owes it to litigants and attorneys alike to adopt and *be consistent* on rules with respect to punitive damages. *And you've done so— you've enunciated a rule*—and whether I agree with it or disagree with it is immaterial, it seems to me, in terms of the context of your question. Now, if you're going to ... say, well, this is a separate tort, and this is something else, and we should have a cubby hole for each one, we're back where we started before that line of decisions started; I think it would be error of this Court; I think it would be a disservice to this state, to the people, and to the attorneys. And I say that sincerely, and you know, each one of you, that I'm on the other side 99.9% of the time. *But we need a rational rule, and I think you've set one up.* Now, I don't always agree with it—I can't say that. *But it's something I understand, and it's something I can apply, and it's something I can tell my clients is the law, and it's as good as any I can devise. I don't know how you can better it.* And I say that sincerely...." (Emphasis added.)

Contrary to the majority's assertion, the record in this case "demonstrates" that the *Cox* standards are something that can be understood, and something that can be applied. There is nothing in the record of this case to support the majority's statement that the *Cox* standards have "been demonstrated to be at best unworkable and at worst impossible." *Ante* at 668.

The only attempt by the majority to "demonstrate" the *Cox* standards to be unworkable results from an erroneous reading of the decision of this Court in *Jolley v. Puregro Co.,* 94 Idaho 702, 496 P.2d 939 (1972). The majority quotes in part from 94 Idaho at 709, 496 P.2d 939 as follows:

"The difficulty with these standards is that they provide no definable objective guidelines for determining what is a reasonable exemplary damages award; the standards appear to serve merely as ma-

nipulative vehicles by which the reviewing court can substitute its viscerally-dictated judgment for that of the trier of fact. *See generally Summerfield v. Pringle,* 65 Idaho 300, 316 et seq., 144 P.2d 214, 222 et seq. (1943) (J. Ailshie dissenting); Note, 'Exemplary Damages in the Law of Torts,' 70 Harv.L.R. 517, 529–531 (1957)." *Jolley v. Puregro Co., supra,* 94 Idaho at 709, 496 P.2d at 946.

However, a careful reading of the quoted portion from the original text of the opinion, taken in context, will disclose that in using the words, "The difficulty with these standards," the Court in *Jolley* was not referring to the standards of *Cox v. Stolworthy,* as the majority infers, but to the standards which existed prior to *Cox v. Stolworthy.* The Court in *Jolley v. Puregro* upheld and approved the *Cox* standards.

Additionally, the majority appears to have misread the facts in *Jolley v. Puregro.* Thus, the majority states that the Court, in *Jolley,* "attempted to fit various factual situations into one of the three delineated categories ... often without success or, if successful, achieved in an unconvincing manner." *Ante* at 667. Further, the majority states, "Although the case [*Jolley v. Puregro*] clearly involved a private business dispute, we, for reasons which the unkind or critical might call convenience, held the existence of an element of consumer fraud and classified the matter under category one of the *Cox* scheme." *Ante* at 667. However, a careful reading of the facts in *Jolley v. Puregro, supra,* will disclose that not only had the plaintiff Jolley's property been misappropriated by the defendant Puregro, but as the Court noted, "Apparently Puregro also took the equipment of other farmers, at least some of whom reclaimed their equipment from Puregro at their Mountain Home business location." *Supra* 94 Idaho at 704, n. 1, 496 P.2d at 941, n. 1. The Court found evidence of a "knowing 'business practice' of taking other persons' property and, when not immediately reclaimed, selling the same and retaining the funds." *Supra* at 711, 496 P.2d at 946. The Court then noted:

"That brings this case close enough to the *Boise Dodge* case [where Boise Dodge turned back the odometers of several used cars, thereby perpetrating a fraud on several purchasers of those automobiles] to justify an award of additional exemplary damages over and above those additional damages allowable under the general rule in *Cox v. Stolworthy, i.e.,* reasonable attorney fees, witness fees, and other non-compensable litigation costs including lost time and inconvenience." *Id.*

Thus, the majority's statement that *"Cox* has been demonstrated to be at best unworkable and at worst impossible" finds no support in the record of this case, or in our previous cases, particularly *Jolley v. Puregro.*

The other premise upon which the majority relies in overruling *Cox v. Stolworthy* is that the definitive standards set out in *Cox* are "inconsistent with [the] law as i* relates to other damages ...." *Ante* at 667. The majority again states that theme at page 668 when it states, "A judge or jury should not be hampered with strictly construed schemes or rules which inappropriately require the forcing of many-faceted fact patterns into neat pigeonholes or compartments. Such deference to the trial court is consistent with the appellate overview of compensatory damages." However, a review of the law as it relates to compensatory damages will disclose that the *Cox v. Stolworthy* standards are much less strict and give a great deal more latitude to the factfinder than often do the rules and standards relating to compensatory damages. For example, this Court has previously adopted specific formulas to be utilized by trial courts in computing an award of compensatory damages. The area of the law involving injury to property is replete with such formulas. For instance, the measure of damages for temporary injury to property generally is the diminution in the rental value of the property or the amount necessary to restore it to its former condition. *Bradford v. Simpson,* 97 Idaho 188, 541 P.2d 612, appeal after remand, 98 Idaho 830, 573 P.2d 149 (1975): *see Alesko v. Union Pacific*

*RR. Co.,* 62 Idaho 235, 109 P.2d 874 (1941) (if injury is temporary, value of premises in original condition or diminution in market value is limit of recovery if smaller than cost of restoration). If the property is totally destroyed, the measure of damages is the value of the property at the time and place of its destruction. *Skaggs Drug Centers, Inc. v. City of Idaho Falls,* 90 Idaho 1, 407 P.2d 695 (1965). On the other hand, if property is only partially destroyed, the measure of damages is the difference between the reasonable market value of the property at the place of injury, immediately before and immediately after injury or, if such sum be less, the reasonable cost of repairs to restore the property to its previous condition. *Id; see also C.C. Anderson Stores Co. v. Boise Water Corp.,* 84 Idaho 355, 372 P.2d 752 (1962); *Thompson v. First Security Bank of Idaho, N.A.,* 82 Idaho 259, 352 P.2d 243 (1960). Similarly, specific rules regarding the measure of damages to be awarded for crop loss have been developed. As stated in *Eliopulos v. Kondo Farms, Inc.,* 102 Idaho 915, 919, 643 P.2d 1085, 1089 (Ida.App.1982), "The measure of damages for crop loss is the difference between the value of crops actually raised, and the value of crops that would have been raised under normal conditions." *See Casey v. Nampa & Meridian Irr. Dist.,* 85 Idaho 299, 379 P.2d 409 (1963) (less the cost of maturing, harvesting and marketing).

Damages to be awarded in cases involving sales agreements are also to be determined under specific guidelines. In *Snook v. Olinger,* 36 Idaho 423, 211 P. 559 (1922), this Court stated that damages to be awarded to a buyer for a seller's failure to deliver goods, in breach of contract, is the difference between the agreed purchase price of the goods and the market price of similar goods in the vicinity at the time delivery should have been made. *See Bowman v. Adams,* 45 Idaho 217, 261 P. 679 (1927) (seller's remedy). Upon a buyer's refusal of acceptance, a seller is entitled to resell the goods and recover the difference between the contract price and the price received on resale. *See Hisaw v. Ingram,*

94 Idaho 751, 497 P.2d 1052 (1972); *Ore-Ida Potato Products, Inc. v. Larsen,* 83 Idaho 290, 362 P.2d 384 (1961).

This Court has fixed the measure of damages to be awarded in other types of contract cases as well. In a case involving the breach of a construction contract, the measure of damages to be awarded is the market price of completing or correcting the work. *See Nelson v. Hazel,* 91 Idaho 850, 433 P.2d 120 (1967); *Boise City v. National Surety Co.,* 30 Idaho 455, 165 P. 1131 (1917). When a defective piece of equipment is installed and full contract price is not paid, the measure of damages for the breach of contract is, in addition to special damages, the difference between the amount actually paid by the owner and the reasonable value of the equipment received. *See Rino v. State-wide Plumbing & Heating Co.,* 74 Idaho 374, 262 P.2d 1003 (1953).

Finally, in cases involving the transfer of real property the measure of damages to which a vendor is entitled upon a buyer's default is the difference between the contract price and the market value of the premises at the time of breach. *See Smith v. King,* 100 Idaho 331, 597 P.2d 217 (1979) (damages usually enhanced by rental value of premises during purchaser's occupation); *Anderson v. Michel,* 88 Idaho 228, 398 P.2d 228 (1965) (unless parties have otherwise stipulated); *State ex rel. Robins v. Clinger,* 72 Idaho 222, 238 P.2d 1145 (1951). Conversely, damages to which a purchaser of land is entitled upon the seller's breach of contract is the difference between the actual value of the property received and the purchase price. *See Smith v. Holmquist,* 47 Idaho 611, 277 P. 574 (1929).

The foregoing list of cases setting the standards for the measurement of damages previously applied by this Court in reviewing awards of compensatory damages is not exhaustive. It merely illustrates that even awards of compensatory damages must comply with strict standards set by this Court and are not within the unlimited discretion of the factfinder.

In overruling *Cox,* the majority abandons the punitive damages standards utilized consistently and successfully by this Court for more than ten years in favor of a system which employs no guidelines whatsoever. The majority places the decision of whether to award punitive damages and the amount of such an award entirely within the discretion of the trier of fact, which in turn is subject to review under the discretion of the trial court. The *ad hoc* punitive damage awards that are sure to follow will result in inconsistency and unpredictability in this area of the law. Furthermore, the resulting inconsistency will lead to ever-more appeals of punitive damage awards, requiring the appellate courts to make a determination of whether an abuse of discretion in awarding the punitive damages has been shown, another *ad hoc* determination.

The so-called "general advisory guidelines" which the majority now says will be applicable to punitive damage awards are merely those rules that were in effect prior to our decision in *Cox* which, because of their uncertainty, led this Court to adopt the standards enunciated therein. In *Jolley v. Puregro, supra,* the Court said of those pre-*Cox* standards:

"The difficulty with these standards [pre-*Cox v. Stolworthy*] is that they provide no definable objective guidelines for determining what is a reasonable exemplary damages award; *the standards appear to serve merely as manipulative vehicles by which the reviewing court can substitute its viscerally-dictated judgment for that of the trier of fact.*" 94 Idaho at 709, 496 P.2d at 946 (citations omitted).

Application of the "rules" advocated by the majority will merely result in one level of discretionary review being followed by another, with each reviewing court substituting its judgment for that of the previous reviewer. This procedure will not be unlike the procedures criticized by Chief Justice Donaldson in *Cooper v. Board of Comm'rs of Ada County,* 101 Idaho 407, 411, 614 P.2d 947, 951 (1980), and will result in "government by men rather than government by law." With today's opinion, the Court has

abandoned a decade's effort to bring some rationality to the law of punitive damages.