817 P.2d 188

**B.R. BETHEL and June R. Bethel, husband and wife, Plaintiffs–Respondents,**

v.

**Walter J. VAN STONE and Margaret Van Stone, husband and wife; Chester R. Van Stone and Meryle Van Stone, husband and wife; and the heirs, successors and assigns of said Walter J. Van Stone, Margaret Van Stone, Chester R. Van Stone and Meryle Van Stone, Defendants,**

**and**

**Dale Van Stone, Defendant–Appellant.**

**No. 18486.**

Court of Appeals of Idaho.

Aug. 20, 1991.

Roger M. Hanlon, Sandpoint, for defendant-appellant.

Everett D. Hofmeister, Coeur d'Alene, for plaintiffs-respondents.

SWANSTROM, Judge.

The Bethels brought this action against the Van Stones to enjoin interference with the Bethels' use of an easement which the Bethels claim was conveyed to them by a warranty deed from Walter and Margaret Van Stone in 1974. The Bethels also sought damages against Dale Van Stone for blocking the easement. After a bench

trial, the district court ruled for the plaintiffs and awarded them punitive damages and damages for emotional distress. Only Dale Van Stone appealed, contending the award of damages is not supported by the evidence. Also, he contends that the trial court erred in construing a written "easement," as creating a sixty-foot easement through a meadow on the Van Stone property. Dale also contends that the trial court erred in dismissing his counterclaim for damages he suffered when the Bethels blocked his use of another road. We uphold the Bethels' right to an easement but remand for entry of an amended judgment fixing and describing the location of the easement, and we reverse the award of damages to the plaintiffs. Also we conclude that Dale Van Stone is not entitled to damages on his counterclaim.

This controversy developed a decade after the Bethels bought property overlooking Lake Pend Oreille, near the town of East Hope in Bonner County, Idaho, from Walter and Margaret Van Stone in 1974. The warranty deed conveyed to the Bethels a large timbered tract, three-fourths of a mile east and west by 560 feet north and south, described as the north 560 feet of Government Lots 1, 2 and 3 of Section 1, Township 56 North, Range 1 East, Boise Meridian (excepting a small triangular piece off of the southwest corner).

As we discuss later, the Bethels' deed also conveyed to them a one-half interest in "Tax # 50," a strip of land about twenty-three feet wide by 270 feet long lying in the south half of lot 3. Following the descriptions of the property conveyed, the deed recited:

TOGETHER WITH easements for ingress and egress which are of record, and RESERVING in grantors the continued use of any easements over and across the property to serve other properties belonging to grantors.

The parties agree there were two easements "of record" which the deed from Walter and Margaret Van Stone conveyed to the Bethels in 1974.

The first is an easement recorded in 1972 when Walter and Margaret Van Stone owned the "north 560 feet of Government Lots 1, 2 and 3" (hereinafter Walter's property) and Chester and Meryle Van Stone owned the south 760 feet of these lots (hereinafter Chester's property). The easement named the Chester Van Stones as grantors and the Walter Van Stones as grantees. This easement contains the following statements:

WHEREAS, Grantees are desires [sic] of obtaining a definite means of ingress and egress from State Highway No. 200 over and across Grantors' properties, which Grantors are able and willing to give, Now, Therefore:

Said Grantors do hereby grant unto said Grantees a perpetual easement for ingress and egress from Grantees' properties to State Highway No. 200 over and across Grantors' land, and which is described as follows:

There followed a metes and bounds description of an easement sixteen feet wide running generally in a south to north direction about 465 feet in length. At the southerly end of this easement lies State Highway 200 and its northerly end is on the east-west property line dividing Walter's property from Chester's property. This easement, which we will refer to as the "sixteen-foot easement," lies wholly within lot 3 in close proximity to "Tax # 50."

The second easement which the parties agree was "of record" when the Bethels purchased the property is a so-called "mutual" easement sixty feet in width dated December 16, 1974, the same date as the Van Stone–Bethel deed.

The trial record discloses that because the Walter Van Stones were selling their property in lots 1, 2 and 3 to the Bethels, but still owned other property in the area, they wanted to be assured of having an easement through the Bethels' property. On the other hand, the Bethels needed the right to use the same east-west road running across lots 1, 2 and 3. Because the existing road meandered across the southern boundary of the Bethels' property onto Chester's property, the Bethels wanted an easement of record which would be appurtenant to the property they were purchas-

ing from Walter. Likewise, Chester wanted to be able to continue to use the road after the Bethels purchased Walter's property. It is quite apparent that Walter, Chester and the Bethels would all benefit from the mutual sixty-foot easement which was prepared and executed contemporaneously with the sale of Walter's property to the Bethels. Unfortunately, this easement was so general and vague in describing the "existing road" that the intent of the parties could not be determined from the document alone. Because the intent of the parties who signed this instrument is the critical issue in the case, we will set out the entire body of the easement:

WHEREAS, WALTER J. VAN STONE and MARGARET A. VAN STONE, his wife, and CHESTER E. VAN STONE and MERYLE J. VAN STONE, his wife, previously owned as tenants in common Government Lots 1, 2 and 3 in Section 1, Township 56 North, Range 1 East, Boise Meridian, Bonner County, Idaho, and

WHEREAS, the said properties are and have been served with a road running East and West across said properties, and

WHEREAS, the parties have divided said properties and desire to provide mutual easements for ingress and egress thereto, they do hereby each grant unto the other, their heirs, assigns and personal representatives a perpetual sixty (60) foot easement over and across the existing road as it traverses their respective interests in the said Government Lots 1, 2 and 3 for ingress and egress to these or other properties owned by them.

This "mutual easement," as we shall refer to it, was signed by Walter and Margaret Van Stone and by Chester and Meryle Van Stone.

In *Latham v. Garner*, 105 Idaho 854, 858, 673 P.2d 1048, 1052 (1983), our Supreme Court reviewed the meaning given to a written easement. There the Court said:

An instrument which is reasonably subject to conflicting interpretation is ambiguous. *See Rutter v. McLaughlin*, 101 Idaho 292, 293, 612 P.2d 135, 136 (1980).... When an instrument is ambiguous in nature, the intention of the parties as reflected by all of the circumstances in existence at the time the easement was given must be considered in construing the granting instrument. *Quinn v. Stone*, 75 Idaho 243, 250, 270 P.2d 825, 829–30 (1954); *see Cusic v. Givens*, 70 Idaho 229, 215 P.2d 297 (1950).

■ Here, the district judge correctly held that the mutual easement was ambiguous. He properly considered all of the extrinsic evidence in the record to determine what the intentions of the parties were when they executed and accepted the instrument.

At trial, the parties agreed that a road existed in 1974 which ran generally east and west close to the common boundary line between Walter's property (the north 560 feet of lots 1, 2 and 3) and Chester's property (the south part of the three lots). There was no real dispute that this east-west road was the one referred to in the mutual easement. Its eastern end exited the Bethels' property, going to other property owned by one of the Van Stones. The dispute centered around the western end of the road.

The Bethels claimed that the easement had its beginning in the southeastern part of lot 3, just off of "old Highway 200" at a gate which opened onto a meadow. This part of lot 3 was owned by Chester and Meryle Van Stone when the mutual easement was created in 1974. B.R. Bethel testified that when a realtor first showed him Walter's property, he was driven into the property through this gate. Bethel admitted that no improved road existed through the meadow, but a vehicle could be driven northerly, then westerly up the hill onto Walter's property to reach the east-west road running through lots 1, 2 and 3.

Chester's widow, Meryle, and Chester's son, Dale, disputed that the parties to the mutual easement intended for the Bethels to have a sixty-foot easement through the center of the meadow. Dale argues that the language of the mutual easement refer-

ring to an "existing road ... running East and West across said properties" is inconsistent with the claim of the Bethels. Dale and Meryle testified that no improved road existed through the meadow in 1974. Dale contended that the recorded 1972 "sixteen-foot easement" and Tax # 50 supplied the access road from old Highway 200 through Chester's property to connect with the existing east-west road running along the common boundary. Meryle, who was one of the four parties to the mutual easement and who was one of the owners of the servient property, testified consistently with Dale's position.

Margaret was the only other surviving signer of the mutual easement to testify. Her husband, Walter, died in February, 1976. Margaret agreed that the sixty-foot mutual easement referred to a road which existed in 1974 and which generally followed the east-west boundary between Walter's property and Chester's property. However, she testified that the parties to the mutual easement intended that the western end of the sixty-foot easement would go down through Chester's property to the highway and that the purpose of the mutual easement was to increase the width of the original sixteen-foot easement to sixty feet. She remembered that her husband, Walter, told her "it will make a better road because they [referring to the Bethels] have more land now to work with." She also testified that she thought the Bethels' easement went through the meadow because that was the way she and her husband had always driven.

Bethel testified that he negotiated for a sixty-foot easement through the meadow before he agreed to buy Walter's property. He stated that he was aware of the recorded sixteen-foot access easement which Walter had through Chester's property, but that, during purchase negotiations, he rejected this as inadequate. However, he admitted that he discussed this only with the realtor representing the Walter Van Stones. He had no communications with Chester or Meryle Van Stone, the owners of the meadow, before he purchased Walter's property. The Bethels were not parties to the mutual easement. There is no evidence in the record that the realtor was the agent of the Chester Van Stones. At most, it can be inferred that he was the agent of the Walter Van Stones. Accordingly, to the extent that Bethel's testimony—regarding what the parties to the mutual easement intended—was based on his communications with the realtor, the testimony was without foundation.

Nevertheless, Bethel testified that he often drove a vehicle through the meadow to reach Highway 200, from the time he purchased the property in 1974 until Dale locked the two gates on this road in May, 1985. He used other roads into his property, as well, to reach the east-west road that led past his home. At least two of the roads provided access, at the westerly side of the property, to Highway 200. One of these was a street through the Town of East Hope. Another was a road leading from Highway 200 through the "Ellis property" and through a corner of Chester's property in lot 3 which connected to the east-west road referred to above. These two roads were used by Bethel for logging purposes and during the construction of the Bethels' home. They were also used by the Bethels during the times when Chester or Dale pastured cattle on the meadow and kept the gates closed on both sides of the meadow, and at other times when it was convenient.

As mentioned earlier, when the Bethels purchased Walter's property in 1974, the deed, directly or indirectly, gave them an interest in two other strips of property which lie within Chester's property and which were intended to be used for access from Walter's property to Highway 200. The first of these was specifically described and conveyed in the Bethels' deed. It was described as a one-half interest in Tax # 50, a strip twenty-three feet wide by 270 feet long. According to Bethel's testimony, no road has ever been built on this strip. He testified that it would not be practicable to construct a road on the strip because of a bluff at its lower end where it approaches Highway 200.

As an appurtenance to Walter's property, the sixteen-foot easement which was re-

corded in 1972 was also conveyed to the Bethels. The language of this easement shows that it was intended to provide a way of access from Walter's property, across Chester's property in lot 3, to "State Highway No. 200." Bethel testified that during purchase negotiations he made it clear that this offered easement was not acceptable because it was too narrow, crooked and steep for construction of an adequate access road. At trial, some inconclusive evidence indicated that part of a road on Chester's property used by the parties followed the northern end of the sixteen-foot easement. However, none of the parties produced sufficient evidence at trial to show whether any part of this easement corresponded to the road which the Bethels claimed through Chester's meadow. According to the legal descriptions in the record, Tax # 50 and the southern end of the sixteen-foot easement are in close proximity; it appears that the southern end of the sixteen-foot easement lies somewhere between Tax # 50 and the lower gate of the meadow. However, the simple unscaled sketch which was used throughout the trial in questioning all of the witnesses is too rudimentary to establish with any accuracy the locations of existing roads in relation to property boundaries, physical features of the properties or survey descriptions of easements.

Margaret was the only signer of the mutual easement to state a belief that the parties not only intended to establish a sixty-foot easement along the existing east-west road but also to expand the sixteen-foot easement into a sixty-foot easement. She readily admitted to some confusion and uncertainty on the witness stand, but if her belief were true then the course of the new sixty-foot easement would logically follow the legally described centerline of the recorded sixteen-foot easement. We conclude that Margaret's testimony did not provide sufficient evidence that the sixty-foot mutual easement was intended to go through Chester's meadow.

Nevertheless, we conclude that the evidence was sufficient to show that the parties to the mutual easement intended the Bethels to have a sixty-foot easement for road purposes through Chester's meadow. Chester died in November, 1984, before this dispute arose. For ten years, while Chester was alive, the Bethels drove through the meadow, although, as noted, they also frequently used other roads into their property with permission of the owners of other properties. According to the evidence, Chester never disputed the Bethels' right to go through the meadow. Bethel testified—without objection—that Chester had admitted to him "several times" that he had an easement through the meadow.

■ The evidence is also clear that no developed road existed through the meadow in 1974. The Bethels never did any work in the meadow to make a road and their infrequent travel left barely discernable tracks. The illustrative sketch used at trial simply showed the Bethels' line of travel to be a direct route, apparently through the middle of the meadow.

Not long after the Bethels bought Walter's property, they commenced selective logging of some of the trees. The evidence shows that it would have been advantageous to Bethel and his logger to have some of the timber hauled through the meadow. This would have required some substantial road improvements to be made. Chester objected to this proposal and, as a result, no logs were hauled out through the meadow. The evidence therefore indicates that, while Bethels' chosen direct route through the meadow for their own access had minimal impact on Chester's use of the property, the construction of an all-purpose road through the center of the meadow could have a significant impact on the "servient property."

A similar concern was raised in *Northwest Pipeline Corp. v. Forrest Weaver Farm, Inc.*, 103 Idaho 180, 646 P.2d 422 (1982). There, the Idaho Supreme Court quoted the following language from *Quinn v. Stone*, 75 Idaho 243, 246–47, 270 P.2d 825, 826 (1954):

'[w]here a conveyance of a right of way does not definitely fix its location, the grantee is entitled to a convenient, rea-

sonable, and accessible way within the limits of the grant.' [*quoting* 28 C.J.S., Easements, § 80a, p. 760.]

103 Idaho at 182, 646 P.2d at 424. In *Quinn*, the Court had more fully discussed the rule and had adopted the following statement from *Ingelson v. Olson*, 199 Minn. 422, 272 N.W. 270, 274 (1937):

'When the right of way is not bounded in the grant, the law bounds it by the line of reasonable enjoyment.' This means 'that the easement must be a convenient and suitable way and must not unreasonably interfere with the rights of the owner of the servient estate.' (Citation omitted.)

75 Idaho at 246, 270 P.2d at 827. *See also* 25 AM.JUR.2D, Easements, §§ 64–66.

We believe the present case falls squarely within the rule set forth in *Quinn* and in *Northwest Pipeline*. Here, the trial judge made no findings fixing the location of the sixty-foot easement through the meadow. He simply announced at the conclusion of the evidence that the Bethels were entitled to such an easement. He found only that the southerly end of the easement started at the existing gate leading into the meadow from Highway 200. We do not mean to fault the judge for this deficiency, because no survey evidence was introduced upon which a legal description of any part of the sixty-foot easement could be made.

■ Idaho law requires that a judgment which affects an interest in real property must describe the interests with such certainty that rights and liabilities are clearly fixed. *Palmer v. Fitzpatrick*, 97 Idaho 925, 557 P.2d 203 (1976); *Seccombe v. Weeks*, 115 Idaho 433, 767 P.2d 276 (Ct. App.1989). *See also Christensen v. Ruffing*, 117 Idaho 1047, 793 P.2d 720 (Ct.App. 1990). This case must be remanded for that purpose. The entire length of the easement across Government Lots 1, 2 and 3 should be surveyed so that the judgment can contain a precise description of the course and location of the easement. Additional evidence may be taken to determine the precise location of the easement on the respective properties involved in this action. *Sinnett v. Werelus*, 83 Idaho 514, 365 P.2d 952 (1961).

In accordance with the rule stated in *Quinn v. Stone, supra,* the present owner of Chester's property shall have the right in the first instance to locate the road within the meadow, and, "if reasonably suitable for the purpose, a selection of a place cannot be questioned." *Quinn*, 75 Idaho at 246, 270 P.2d at 827. This procedure is in recognition of the right of the owner of the servient property to make such use of his property as he desires, so long as his use is consistent with the easement granted. The owner may choose the location to minimize the impact of the road and to prevent unreasonable interference with the rights of the owner so long as the chosen easement is a convenient and suitable way. *Id.* "If the grantor omits to exercise this right, the grantee may make the selection and his selection will be upheld unless he has abused the right." *Id.* Consistent with these rights, the district court should encourage the parties to agree to the exact location of the entire sixty-foot easement, but to the extent that they are unable or unwilling to do this, the court shall determine a reasonable location that is convenient and suitable. After the survey is completed and approved by the court, the court should enter an amended judgment with a legal description of the easement. Any costs hereinafter incurred shall be assessed as directed by the trial court. *Sinnett v. Werelus, supra.*

■ We now turn to the issue of damages. Dale Van Stone contends that the district court erred in awarding emotional distress damages and punitive damages in favor of the Bethels. The test for recovery of emotional distress damages requires both outrageous conduct causing the mental anguish and that the mental anguish suffered be severe. *Gill v. Brown*, 107 Idaho 1137, 695 P.2d 1276 (Ct.App.1985). *See also Herrera v. Conner*, 111 Idaho 1012, 729 P.2d 1075 (Ct.App.1986). Severe emotional distress, in order to impose liability, must be "so severe that no reasonable person could be expected to endure it." *Brown v. Fritz*, 108 Idaho 357, 361, 699

P.2d 1371, 1375 (1985); Restatement Second of Torts § 46, Comment j (1965).

The Bethels' complaint alleged intentional infliction of emotional distress founded primarily upon the conduct of Dale in locking of the gates and barring the Bethels from the use of the right of way. The Bethels testified that, as a result of this action and other acts of Dale, June Bethel suffered from high blood pressure and that she feared Van Stone. There is conflicting evidence from Dale, who denied all but the locking of the gates in 1985, which he said would remain locked until the Bethels proved to him where the easement was located. The other acts attributed to Dale appeared to be unrelated to the use of the easement by the Bethels and were not noted by the district court in its findings.

We need not decide whether the facts alleged by the Bethels were proven because we conclude that the elements of the test have not been met as a matter of law. The conduct of Dale is not the extreme or outrageous conduct required. As to the severity of the emotional distress, the district judge found "an absence of proof of any *severe* emotional distress." [Emphasis added]. We hold that the award of emotional distress damages must be reversed.

In determining the validity of the award of punitive damages, we defer to the district court in that "[s]uch deference ... is consistent with the appellate overview of compensatory damages." *Cheney v. Palos Verdes Inv. Corp.*, 104 Idaho 897, 904, 665 P.2d 661, 668 (1983). "An award of punitive damages will be sustained on appeal only when it is shown that the defendant acted in a manner that was 'an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or disregard for its likely consequences.'" (Citations omitted.) *Id.* at 905, 665 P.2d at 669.

■ The district court awarded punitive damages to the Bethels and concluded that Dale's locking the gates was "with reckless disregard for the Plaintiffs' rights when there was another option...." The rule of punitive damages is that they cannot be

recovered absent clear evidence that the wrongdoer's action is wanton, malicious, or gross and outrageous. *Linscott v. Rainier Nat. Life Ins. Co.*, 100 Idaho 854, 857, 606 P.2d 958, 961 (1980). Having determined that Dale's conduct was not of the "outrageous" type to meet the standard for emotional distress damages, we are compelled to likewise hold the conduct insufficient to merit an award of punitive damages. Before Dale locked the two gates into the meadow, the Bethels acquired another easement for access to their property through the Town of East Hope. Thus, they had other access over improved roads. Moreover, during those times when Dale had cattle pastured in the meadow, the Bethels declined to use the meadow simply because of the inconvenience of having to open and close the gates. Finally, there is enough ambiguity in the record as to the location of the easements that we are unable to uphold the district judge's conclusion that Dale acted with reckless disregard for the Bethels' rights.

■ On the final issue on appeal, Dale claims as error the district court's dismissal of his counterclaim. Dale alleged that he suffered damage when the Bethels blocked Dale from using a road across the Ellis property. The district court held there was no evidence to show that any of the Van Stones had an easement across the Ellis property, "so that they are without standing to make any claim for interference [sic] by the Plaintiffs having blocked the roadway as it crossed the Plaintiffs' property." We believe the ruling was erroneous because the record supports Dale's long standing permissive use of the road across the Ellis property. Unless that permission were revoked by Ellis, Dale would have "standing" to bring a claim for interference with his use of the road. Nevertheless, if error occurred, it was harmless. Dale failed to present sufficient proof of any damages. Therefore, we hold the district court's dismissal of the counterclaim did not constitute reversible error.

In summary, we uphold the district court's ruling that the Bethels, as well as other parties, have a sixty-foot easement

leading from Highway 200, in the south 760 feet of Government Lot 3, to the north 560 feet of Lot 3, and that this mutual easement continues along an existing road in an easterly direction crossing Lots 3, 2 and 1. We remand for additional evidence to determine the precise location of the easement. We reverse the district court judgment as to the award of damages for emotional distress and punitive damages against Dale. We hold that no reversible error occurred in the denial of Dale's counterclaim. Because each party prevailed in part, we award no costs or attorney fees in this appeal.

WALTERS, C.J., and WINMILL, J., Pro Tem., concur.